# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PAUL CHMIEL, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No.  1:08-cv-00365 (HHK) |
| | ) |
| SEDO.COM, LLC, *et al*. | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DEFENDANT MTLD TOP LEVEL DOMAIN LTD'S OPPOSITION TO PLAINTIFF PAUL CHMIEL'S MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................... ii

I.    RELEVANT FACTS .................................................................................... 3

      A.    Parties and Background ................................................................... 3

      B.    Terms and Conditions that Governed the Auction ................................... 4

      C.    Conduct of the Auction .................................................................... 6

      D.    Continuation of the Auction and Rejection of All Bids Received ................ 8

II.   PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND
      PRELIMINARY INJUNCTION SHOULD BE DENIED ................................ 11

      A.    Legal Standard ............................................................................. 11

      B.    Plaintiff Has Not – and Cannot – Show a Substantial Likelihood of
            Success on the Merits ..................................................................... 13

            1.    Plaintiff's Contract Claim Fails Because He Was Not
                  the Highest Bidder at the End of the Auction Period ................... 14

            2.    Even if Plaintiff Had Been the Highest Bidder at the End of the
                  Auction Period, mTLD Exercised Its Right to Reject Plaintiff's
                  Bids and Precluded Formation of a Contract with Plaintiff ........... 17

            3.    Plaintiff's Contract Claim Fails Because He Knew the Notifications
                  He Received Were Mistaken ............................................... 19

      C.    Plaintiff Has Not Shown that He Will Be Irreparably Harmed if an
            Injunction Does Not Issue ............................................................... 23

      D.    A Preliminary Injunction Would Harm Other Interested Parties and
            the Balance of Harms Does Not Favor Plaintiff ..................................... 26

      E.    The Public Interest Does Not Weigh in Favor of a Preliminary Injunction ......... 28

III.  PLAINTIFF IS NOT ENTITLED TO EXPEDITED DISCOVERY ................... 29

## TABLE OF AUTHORITIES

**CASES**                                                                     **PAGE(S)**

*Caspi v. Microsoft Network, LLC*, 732 A.2d 528 (N.J. App. Div. 1999) ....................................14

*CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738 (D.C. Cir. 1995)...............12, 26

*Clay v. Faison*, 583 A.2d 1388 (D.C. 1990) ............................................................................23

*Cobell v. Norton*, 391 F.3d 251 (D.C. Cir. 2004) ...............................................................12, 26

*Cuba v. Resolution Trust Corp.*, 849 F. Supp. 793 (N.D. Ga. 1994)............................................18

*Disability Rights Council of Greater Washington v. Washington Metropolitan Area
Transit Authority*, 234 F.R.D. 4 (D.D.C. 2006) ............................................................................29

*Donovan v. RRL Corp.*, 26 Cal. 4th 261 (2001) ............................................................................21

*Elsinore Union Elementary School Dist. v. Kastorff*, 54 Cal. 2d 380 (1960)................................21

*Eugene Stud & Veneer, Inc. v. State Board of Forestry*, 469 P.2d 635 (Or. Ct. App.
1970) ................................................................................................................................................18

*Flippo Constr. Co. v. Mike Parks Diving Corp.*, 531 A.2d 263 (D.C. 1987) ..............................20

*Forrest v. Verizon Commc'ns, Inc.*, 805 A.2d 1007 (D.C. 2002) .................................................14

*Hessel v. Christie*, 399 F. Supp. 2d 506 (S.D.N.Y. 2005) .....................................................17, 19

*Hillside Ass'ns of Hollis v. Maine Bonding & Casualty Co.*, 135 N.H. 325 (1992)....................21

*Hubbard v. United States*, 496 F. Supp. 2d 194 (D.D.C. 2007) .................................................29

*Hussain v. Cameron Const. and Roofing Co.*, No. 1677, 2007 WL 824224 (Mass. App.
Div. March 14, 2007).......................................................................................................................25

*Independence Mgmt. Co. v. Anderson & Summers, LLC*, 874 A.2d 862 (D.C. 2005) .................27

*JOGO Assocs. v. United States Dep't of Hous. & Urban Dev.,* No. 92-2451 (NHJ)
(D.D.C. Nov. 25, 1992) ..................................................................................................................25

*Kakaes v. George Washington University*, 790 A.2d 581 (D.C. 2002) ......................................23

*Lawrence Paper Co. v. Rosen & Co.,* 939 F.2d 376 (6th Cir. 1991)............................................18

*Lincoln Hockey, Ltd. Liability Co. v. Semin*, No. 05-02094, 2005 WL 3294008 (D.D.C. December 5, 2005)................................................................................................12

*M. F. Kemper Const. Co. v. City of L.A.*, 37 Cal. 2d 696 (1951)..................................22

*Mazurek v. Armstrong*, 520 U.S. 968 (1997)............................................................11

*Medgar Evers Houses Assocs. v. Carro*, No. 01-CV-6107, 2001 WL 1456190 (E.D.N.Y. Nov. 6, 2001)...........................................................................25, 26

*Mooring Tax Asset Group, LLC v. Marks*, No. 03-CA-5830, 2005 WL 1140448 (D.C. Super. Ct. May 10, 2005)..............................................................................28

*Optic-Electronic Corp. v. United States*, 683 F. Supp. 269 (D.D.C. 1987)..................29

*Philadelphia Newspapers, Inc. v. Gannett Satellite Information Network, Inc.*, No. 98-CV-2782, 1998 WL 404820 (E.D. Pa. July 15, 1998)....................................29

*Qualls v. Rumsfeld,* 357 F. Supp. 2d 274 (D.D.C. 2005) ......................................12, 28

*RCM Technologies, Inc. v. Beacon Hill Staffing Group, LLC*, 502 F. Supp. 2d 70 (D.D.C. 2007) ......................................................................................13

*Societe Nationale Industrielle Aerospatiale v. United States*, 482 U.S. 522 (1987) ....................30

*Southland Corp. v. Godette*, 793 F. Supp. 348 (D.D.C. 1992) ..............................12, 23

*Young v. Hefton*, 173 P.3d 671 (Kan. App. 2007) ........................................................17

*Zysk v. Baker*, No. 2005-0003, 2006 WL 412171 (Mass. Super. Dec. 11, 2006).......................20

## STATUTES

D.C. Code 28:2-328  ………………………………………………………………………15

## OTHER AUTHORITIES

*Restatement 2d of Contracts* §152 (2007) ....................................................................20

*Restatement 2d of Contracts* §153 (2007) ...............................................................20, 21

*Restatement 2d of Contracts* §154 (2007) ....................................................................21

1 *Williston on Contracts* § 4:12 (4th ed.) (2007) ........................................................18

## INTRODUCTION

Plaintiff is not entitled to the extraordinary relief of a preliminary injunction because he has failed to show that he is likely to succeed on the merits – indeed, it is clear that he cannot – or that he would be irreparably harmed if this Court fails to issue an emergency stay.

This case concerns an internet domain name auction in which a disgruntled prospective buyer is dissatisfied with the results of an auction in which he unsuccessfully bid for the rights to register and use five domain names for websites intended to be accessed through cell phones and other mobile devices – domain names ending in ".mobi".  Plaintiff, Paul Chmiel, is a sophisticated entrepreneur well-acquainted with the internet domain business.  He is the registrant of approximately 400 domain names in the .mobi domain, some of which he has developed into websites and some of which he uses to generate revenues through advertising or through resale of the registration rights.  Defendant mTLD Top Level Domain, Ltd. ("mTLD") is the authorized global "registry" for .mobi domain names.

Plaintiff was not the highest bidder for *any* of the domain-name authorization codes he is now seeking.  Instead, he is attempting to take advantage of the fact that the entity that ran the auction on behalf of mTLD – Defendant Sedo.com, LLC ("Sedo") – had one or more of its computer servers crash shortly before the auction was scheduled to end.  As a result of that crash, the auction system did not consider all of the bids that had been submitted and mistakenly identified bids from Plaintiff as the highest bids for the five domain name codes at issue – even though others had submitted higher bids for each of those codes before the scheduled close of the auction.  Before the server outage was resolved, Plaintiff received automatically generated notifications from a Sedo server erroneously stating that he was the winner of these five auctions.

Despite receiving numerous subsequent notifications from Sedo and mTLD shortly thereafter explaining that a server outage had occurred, that the automatically generated

notifications were sent in error, and that bidding in the auction would continue, Plaintiff claims that the erroneous notifications created a contract under which he is entitled to receive the authorization codes for the five domain names. He makes this claim even though, when the auction continued after the servers were restored, Plaintiff continued to place bids on some of the very names he now claims he had already won (as well as other names), demonstrating that Plaintiff knew then, as he does now, that he was not the winner of the authorization codes for these five domain names.

Plaintiff has not carried his burden of showing he is likely to succeed on the merits of his claims. Indeed, he cannot do so for at least three reasons. *First*, under the rules governing the auction to which Plaintiff had agreed, a binding contract could be formed only with the bidder "who placed the highest bid as reflected at the end of the Auction Period." As noted above, Plaintiff cannot make that showing, even if the end of the auction is deemed to be the originally scheduled time as he erroneously claims. That is all the more true if the end of the Auction Period is deemed to be (as it should) the end of the continued auction once the servers were restored. *Second*, mTLD reserved the right to "reject a bid from any Participant for any reason," a provision that, as the case law makes clear, gives the seller the right to reject a bid, even if the auctioneer (in this case, Sedo) has accepted it. Here, in light of the technical difficulties and subsequent complaints from bidders, mTLD chose to reject all bids and void the auction so as to sort out the competing claims of bidders and reach a fair result. Thus no binding contract was formed as a result of Plaintiff's bids. *Third*, even if the erroneous notification were deemed to form a contract notwithstanding the terms of the auction to which Plaintiff was bound, it is clear that such a contract would have been the product of a material mistake of which Plaintiff knew, or at least had reason to know, and thus the contract could be voided.

Even if Plaintiff had somehow borne his burden of making a substantial showing that he was likely to succeed on the merits – which he has not – Plaintiff still would not be entitled to a stay because he will not be *irreparably* harmed if the domain names are transferred to third parties.  All of the evidence is that the generic domain name registration codes at issue here are largely fungible commodities that Plaintiff was acquiring for a commercial purpose.  The injury he has suffered, if any, would be more than adequately compensated by an award of money damages.  Thus, there is no reason for the Court to depart from the ordinary rule that relief should wait for a full adjudication on the merits.

At bottom, Plaintiff has brought this case in the hopes of converting the auctioneer's server error into a windfall:  his bids were almost 40 percent below the going price in the auction at the originally scheduled end of the auction, and by the time the bidding concluded later that day after the servers had been restored, his bids were more than 70 percent below what others were offering.  Plaintiff did not bargain for this result – in fact, he committed himself to observe the contrary result – and he is not entitled to the registration rights for the domain names.

## I.     RELEVANT FACTS

### A.     Parties and Background

Defendant mLTD is a private company limited by shares organized under the laws of Ireland, with its principal place of business in Dublin, Ireland.  (Declaration of Caroline Greer, attached hereto as Attachment A ¶ 1.)  mTLD is the official global registry for the .mobi top-level domain.  (*Id.* ¶ 3.)  A "top-level domain" is the last part of an Internet domain name (e.g., the ".com" in "google.com").  The .mobi top-level domain is intended to be used for websites accessed through mobile devices such as wireless phones.  As the official registry, mTLD is charged with maintaining the master database that records who is registered and authorized to use each particular domain name ending in .mobi.

In September 2007, mTLD contracted with Sedo – which operates a marketplace for the buying and selling of the right to use particular domain names and has substantial experience in conducting internet auctions for such rights – to provide professional brokerage and auction services for the authorization codes necessary to register and use certain .mobi domain names. (Greer Decl. ¶ 7.)  The codes were to be sold in three auctions.  The first of the auctions commenced on or around September 26, 2007, and ended seven days later on October 3, 2007, without incident.  (*Id.* ¶¶ 9,10.)  The second auction started on October 31, 2007 and was also completed successfully seven days later on November 7, 2007.  (*Id.*)  The third of mTLD's domain name auctions, which commenced on November 28, 2007, and ended on December 5, 2007, is at issue in this case.  (*Id.*)

Plaintiff is an entrepreneur who is involved in the business of acquiring domain name registrations for commercial use through, among other things, development of sites at those domain names and resale of domain names.  As of March 14, 2008, Plaintiff held registration rights for approximately 428 .mobi domain names.  (Greer Decl. ¶ 4; "Chmiel Registered Domains List", attached to Greer Decl. as Ex. A.)  Plaintiff participated as a bidder in all three of the .mobi auctions.  (Declaration of Ulrich Priesner, attached hereto, ¶ 8.)  In the first two auctions, he was the highest bidder for the authorization code for one .mobi domain, gps.mobi, although he bid on, but lost, a number of others.  (*Id.*)

**B.     Terms and Conditions that Governed the Auction**

Two contracts governed the .mobi internet auctions.  The first is the Sedo User Agreement.  (Attached to Priesner Decl. as Exhibit A).  Prospective buyers who intended to participate in Sedo auctions were first required to register with Sedo, and as part of the registration process, to check a box "confirm[ing] that I have read the Sedo's User Agreement

and Privacy Policy."  (Preisner Decl. ¶¶ 6, 7.)  Plaintiff registered to use the Sedo website's

services on December 24, 2006.  (Priesner Decl. ¶ 8.)

Section 5.1.2.4. of the Sedo User Agreement, entitled "**Auction Period and Transfer,**"

provided that in an auction held with reserve, such as the auction at issue here, if a bid is

received that is higher than the bid that began the auction,

> and the Auction was not cancelled by Sedo or otherwise, a legally
> binding contract exists between the Seller and the prospective
> Buyer who placed the highest bid as reflected at the end of the
> Auction Period.

(Preisner Decl. Ex. A  §5.1.2.4.)  With respect to the end of the Auction Period, Section 5.1.2.3

"**End of Auction**" provided that:

> Generally, an Auction Period will run for a seven day period. …
> Upon approaching the close of the seventh day, the Auction Period
> will extend for ten minutes each time a valid offer is placed within
> the last five minutes of the Auction Period.

(*Id.* 5.1.2.3.)  Thus, the Auction Period could be extended any number of times, so long as new

bids continued to timely arrive.  (*Id.*)

The second applicable contract is the dotMobi Auction End User Agreement (also

referred to as the "dotMobi Auction Agreement").  (Attached to the Greer Decl. as Exhibit B.)

When mTLD announced the auctions at issue in this litigation in the Fall of 2007, it advised

potential bidders that "[t]he auction rules will follow Sedo's standard Terms and Conditions,"

subject to certain conditions set by mTLD.  (*See* Pl.'s Br. Exs. 1, 21.)   The announcement was

published on a webpage dedicated to the auction, and further advised that "[b]y participating in

the online auction, you hereby agree to the .mobi Auction End User Agreement," which could be

viewed by clicking on a link.  (*Id.*).[1/]  In conjunction with mTLD's announcement of the auction,

---

[1/]      The Auction End User Agreement provided, in its preamble:  "YOU MUST READ AND AGREE TO THE
FOLLOWING TERMS AND CONDITIONS SET FORTH IN THIS DOTMOBI AUCTION AGREEMENT

Sedo also published a press release. (*See* Pl.'s Br. Ex. 3.) This press release directed readers to the mTLD announcement, stating: "Full information, including the list of auction names, is located on the dotMobi website at http://preimumauction.mobi." (*Id.*) Plaintiff attached a screenshot of the mTLD auction page and this Sedo press release to his brief in support of this motion as Exhibits 1, 3 and 21. (*Id.*)

The Preamble to the dotMobi Auction End User Agreement explained that its terms were "in addition to, and not in place of" agreements between bidders and the auction organizer (here, Sedo), and that:

> In the event of a conflict between the terms of this Auction Agreement and any such agreement relating to your participation in the Auction or use of an Authorization Code, the terms of this Auction Agreement shall prevail.

(Greer Decl. Ex. B, Preamble.) Section 5 of the Auction End User Agreement, "**Bids and Conduct of the Auction**" provided that:

> mTLD reserves the right in its sole discretion to reject a bid from any Participant for any reason.

(*Id.* ¶ 5.)

### C.    Conduct of the Auction

The auction that concluded on December 5, 2007 was interrupted when a Sedo server auction server became overwhelmed and eventually locked. (Priesner Decl. ¶ 10.) To understand how the server failure affected the auction, it is helpful to understand some of the auction's basic mechanics. The auction was conducted over the Internet. Each of the domain name authorization codes that were offered for bid was given a dedicated webpage on Sedo's website, which identified the domain name and provided other relevant information, such as the

---

BEFORE PARTICIPATING IN THE DOMAIN AUCTION. YOUR REGISTRATION FOR AND PARTICIPATION IN THE DOMAIN AUCTION CONSTITUTES YOUR ACCEPTANCE OF THIS AUCTION AGREEMENT. … By registering for and participating in the Auction, You acknowledge that you have read, agree with, and accept all of the terms and conditions contained in this Auction Agreement." (Priesner Decl. Ex. B.)

bidding history for the code. (*Id.* ¶ 11.) Prospective bidders who had registered with Sedo could use these sites to track the progress of the auction and to submit bids. (*Id.* ¶ 12.) Bidders could also submit a "proxy" that would cause Sedo to place bids on the buyer's behalf, up to a maximum amount specified by the bidder. (*Id.*)

As each bid was placed, it was logged by one of the servers that hosted Sedo's website (the "web servers"), and then forwarded to other servers in Germany that were managing the auction (the "auction servers"). (Priesner Decl. ¶ 13.) The auction servers were to examine each new bid to determine whether it represented a new high bid and whether it triggered the placement of a proxy bid in response. (*Id.* ¶ 14.) When the evaluation showed that a new high bid had been placed, the auction servers would communicate the news back to the web servers, and they would display the new high bid on the appropriate auction web page. (*Id.*) The auction servers were also to determine whether a new high bid had been submitted within the last five minutes of an Auction Period, and if so, they were to extend the auction an additional ten minutes. (*Id.* ¶ 15.)

Bidding in the Auction that began on November 28, 2007 proceeded normally until shortly before noon on December 5, when the Auction Period was scheduled to end unless it was extended by a bid in the final five minutes. (*Id.* ¶ 16.) On that day, Sedo experienced unprecedented level of activity that caused its auction servers to become overwhelmed and to lock sometime between 10-25 minutes before noon.[2] Sedo had conducted hundreds of previous auctions, and had never encountered similar levels of activity. (*Id.*)

Because the web servers continued to function, bidders could view auction web pages and continued to place bids that were logged by Sedo's web servers even though they were not then displayed on the appropriate auction web page. (*Id.* ¶ 22.) In fact, a number of new high

---

[2]       All times referenced herein are in Eastern Standard Time.

bids were placed for each of the domain name authorization codes at issue in this case after the auction servers locked. (*Id.* ¶ 24, 26.) At noon, Plaintiff was not the highest bidder for *any* of the domain name authorization codes he is seeking in this litigation, and for some he had been outbid by substantial margins:

- photo.mobi: Plaintiff's highest bid was $6,100. At 11:59 a.m., another user bid $6,250. (Priesner Decl. ¶24(e), ¶41(a).)

- photos.mobi: Plaintiff's highest bid (a proxy bid placed by Sedo) was $6350. At 11:59 a.m., another user bid $12,500. (*Id.* ¶24(c), ¶41(b).)

- sports.mobi: Plaintiff's highest bid was $31,000. At 11:58 a.m., another user bid $36,000. (*Id.* ¶24(c), ¶41(c)).

- video.mobi: Plaintiff's highest bid (a proxy bid placed by Sedo) was $11,000. At 11:58 a.m., another user bid $20,000. (*Id.* ¶24(c), ¶41(c).)

- videos.mobi: Plaintiff's highest bid was $15,500. At 11:56 a.m., another user bid $40,000. (*Id.* ¶24(c), ¶41(c).)[3]

In addition, because at least one new high bid had been placed for each of these domain name codes during the last five minutes of the relevant Auction Period, each of the Auction Periods should have been extended to allow more time for prospective buyers to continue bidding. Because the auction servers were locked, this did not occur. (*Id.* ¶ 27.)

### D.   Continuation of the Auction and Rejection of All Bids Received

Shortly after noon, while Sedo's auction servers were offline, an automated process directed by Sedo's server erroneously selected bids submitted by Mr. Chmiel as the apparent highest bids for photo.mobi, photos.mobi, sports.mobi, video.mobi, and videos.mobi. (*Id.* ¶¶ 28-29.) These selections were based on the last bids that the auction server had evaluated before going offline, and did not take into account the higher bids that had been placed by other users

---

[3]     Plaintiff had given Sedo his proxy to place bids for two of the authorization codes at issue (up to $10,000 for photo.mobi and up to $40,000 for sports.mobi). Sedo's computers did not place those bids on behalf of Plaintiff due to the same server issues that created problems in the auction generally. Other bidders, of course, did not have a chance to respond to those bids. (Priesner Decl. ¶ 25.)

before noon.  (*Id.* ¶¶ 28-29.)  Sedo's computer system then sent Plaintiff the automated emails on which he relies in this lawsuit and to post the web message upon which he relies. (*Id.* ¶ 30.)  The emails and web message were not sent by or reviewed by any natural person before they were transmitted.  (*Id.*)

In light of the confusion caused by the server failure, Sedo decided to continue the auction.  (Priesner Decl. ¶ 31; Greer Decl. ¶¶ 11, 12.)  At or about 12:45 p.m. it posted a notice on its website to inform bidders that its server was unavailable and that the auction of the mTLD domain name authorization codes would therefore be continued.  (Priesner Decl. ¶ 31.)  At or about 12:50 p.m., Sedo notified registered users via email that the Auction Period would be extended until 3:00 p.m. EST.  (*Id.* ¶ 32.)  In this email, Sedo explained that although some bidders may have received emails saying that they won the auction, those bids were not binding according to Sedo's terms and conditions and that the auction would continue.   (*See* Priesner Decl. Ex. B.; *see also* Priesner Decl. ¶ 32.)  A second email with the same explanation was sent to registered users at 2:05 p.m.  (*See* Priesner Decl. Ex. C; *see also* Priesner Decl. ¶ 33.)

mTLD was not immediately aware that Sedo's auction server had become unavailable or that Sedo had decided to extend the auction.  (Greer Decl. ¶ 12.)  When it was subsequently apprised of what had happened, mTLD sought to notify bidders that the auction had been extended.  (*Id.* ¶¶ 13-14.)  As it did not have access to bidder identities during the auction, it used two substitute methods.  (*Id.*)  At about 1:23 p.m., mTLD posted information about the extension on its website.  (*Id.*; Pl.'s Br., Ex 17)  At about 1:53 p.m., mTLD also sent an email to individuals in its database, including Plaintiff, who had previously expressed interest in .mobi domain names.  (Greer Decl. ¶ 14; Pl.'s Br. Ex. 18.)

- 9 -

When the Auction continued at about 1:00 p.m., Plaintiff bid on the authorization codes for at least five domain names, two of which he now claims to have already won at noon. (Priesner Decl. ¶¶ 34.)  For example:

- photo.mobi.  Plaintiff placed a bid in the amount of $10,550 at 1:39 p.m.  (*Id.* ¶ 36.)

- photos.mobi.  Plaintiff placed a bid in the amount of $15,000 at 1:17 p.m.; $15,500 at 1:19 p.m.; $20,000 at 2:36 p.m.; $25,000 at 2:38 p.m.; $30,000 at 2:50 p.m.; $34,600 at 2:51 p.m.; $45,000 at 2:58 p.m.; and $50,000 at 3:21 p.m.  (*Id.* ¶ 37.)

- game.mobi:  Plaintiff placed bids in the amount of $40,000 at 2:45 p.m.; $50,000 at 2:46 p.m.; $51,000 at 2:53 p.m.; $55,000 at 3:07 p.m.; and $60,000 at 3:26 p.m.  (*Id.* ¶ 38.)

- music.mobi:  Plaintiff placed bids in the amount of $75,000 at 1:03 p.m. and $80,000 at 1:06 p.m.  (*Id.* ¶ 39.)

- radio.mobi:  Plaintiff placed bids in the amount of $12,000 at 2:25 p.m.; $16,000 at 3:02 p.m.; $21,000 at 3:24 p.m.; $26,500 at 3:35 p.m.; and $30,500 at 3:43 p.m.  (*Id.* ¶ 40.)

When the auction concluded later that afternoon, Plaintiff had not placed the highest bid for any of the domain name authorization codes he is seeking in this lawsuit.  (*Id.* ¶ 41.)  The winning bids for those codes, which are two to eight times higher than the bids that Plaintiff is now trying to enforce as the "highest" bids, were as follows:

- photo.mobi:  $19,500.  (*Id.*)

- photos.mobi:  $51,000.  (*Id.*)

- sports.mobi:  $101,000.  (*Id.*)

- video.mobi:  $25,555.  (*Id.*)

- videos.mobi:  $51,000.  (*Id.*)

After the auction ended, there were a number of complaints from prospective bidders about the confusion that had been caused by the server outage.  (*See* Greer Decl. ¶ 15).  On December 17, 2007, after careful consideration, and pursuant to the terms of the dotMobi End

User Agreement, mTLD decided to reject the bids placed in the December 5 auction by voiding the entire auction. (*Id.*)

On January 18, 2008, Plaintiff and three other individuals filed a Complaint that initiated this litigation in the Superior Court for the District of Columbia. Plaintiff did not seek a Temporary Restraining Order or Preliminary Injunction at that time.

On February 11, 2008, mTLD entered an agreement with Jean Romain Columbani under which it agreed to release to him the authorization code for the domain name "video.mobi." (*Id.* ¶ 16.) Mr. Columbani had been the highest bidder for the video.mobi registration on December 5, 2007, having placed a bid of $25,555. (*Id.*) The agreement noted that another auction participant had challenged ownership of the video.mobi authorization code and contained terms relating to that claim. (*Id.*)

A Notice of Settlement was subsequently filed with the Superior Court indicating that the three original plaintiffs other than Plaintiff Chmiel had reached settlements with mTLD. On February 29, 2008 Plaintiff filed a motion for a Temporary Restraining Order, Protective Order and Expedited Discovery in the Superior Court. This case was removed to this Court on February 29, 2008, and on March 6, 2008, Plaintiff filed the instant amended Motion.

## ARGUMENT

## II. PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION SHOULD BE DENIED

### A.    Legal Standard

Because a preliminary injunction restricts the rights of a defendant before a final adjudication on the merits of a plaintiff's claims, it is "an extraordinary and drastic remedy … that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997)

- 11 -

(emphasis in original).  *See also Lincoln Hockey, Ltd. Liability Co. v. Semin*, 2005 WL 3294008, *2 (D.D.C. 2005) (a preliminary injunction "is not a form of relief granted lightly.") (citation omitted).

To obtain a preliminary injunction, the party seeking the injunction must show "(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable harm without injunctive relief; (3) that an injunction would not substantially harm other interested parties, and (4) that issuance of the injunction is in the public interest." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004) (citations omitted).

Although courts "balance the strengths of the [party's] arguments in each of the four required areas," *see CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 747 (D.C. Cir. 1995), a movant's failure to show either irreparable harm or a substantial likelihood of success on the merits leads directly to the denial of a motion for preliminary injunction.  *See*, *e.g.*, *id.* (denial where party did not show irreparable harm); *Southland Co. v. Godette*, 793 F. Supp. 348, 352 (D.D.C. 1992) (same); *Lincoln Hockey, Ltd. Liability Co.*, 2005 WL 3294008, at *2 ("Indeed, absent a 'substantial indication' of likely success on the merits, 'there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review.'") (quoting *American Bankers Ass'n v. Nat'l Credit Union Admin*, 38 F.Supp.2d 114, 140 (D.D.C. 1999)).

When moving the court for a preliminary injunction, the party seeking the injunction "bear[s] the burdens of production and persuasion." *Qualls v. Rumsfeld*, 357 F. Supp. 2d 274, 281 (D.D.C. 2005).  Although the party may rely on "evidence that is less complete than in a trial on the merits," it must offer "credible evidence" on each material point to prevail. *Id.* (quotation marks and citations omitted).  And, "[a]s support for a preliminary injunction the court can

consider only facts presented by affidavit or testimony and cannot consider facts provable under the modern liberal interpretation of the complaint but which have not been proved." *Id.* (internal quotation marks and citation omitted).

Plaintiff – who does not so much as offer any affidavit – has failed to carry his burden of production or persuasion as to each of these four necessary factors.[4/]

## B.    Plaintiff Has Not – and Cannot – Show a Substantial Likelihood of Success on the Merits

Plaintiff is unlikely to prevail on the merits of his claims against mTLD and Sedo. Plaintiff argues that he has a contract to purchase the authorization codes for the five disputed domain names from mTLD because he received automatically generated notifications from Sedo's computer during the server outage which misinformed him that he was the highest bidder. This is wrong for at least three reasons. *First*, under the Sedo User Agreement to which Plaintiff agreed to be bound, a contract could form only with the "highest bidder at the end of the Auction Period," and Plaintiff did not meet that condition. (Priesner Decl. Ex. A §5.1.2.4). *Second*, even if Plaintiff had been the highest bidder (which he was not), under the express terms of the dotMobi End User Agreement, mTLD reserved the right to reject a bid for any reason, and it has rejected Plaintiff's bids. *Third*, even if the erroneous notifications were deemed to be an "acceptance" of Plaintiff's bid, any contract that formed would be voidable, because those notifications were predicated on a material mistake of which Plaintiff knew or at least had reason to know.

---

[4/]    Although the title of Plaintiff's motion indicates that he is seeking a temporary restraining order, he does not refer to a TRO in his argument or discuss the legal standard that applies. To the extent he is requesting a TRO, it should be denied for the same reasons that his request for a preliminary injunction should be denied. *RCM Technologies, Inc. v. Beacon Hill Staffing Group, LLC*, 502 F. Supp. 2d 70 (D.D.C. 2007) (setting forth four-prong test for evaluating application for a TRO).

1.    **Plaintiff's Contract Claim Fails Because He Was Not the Highest
      Bidder at the End of the Auction Period.**

Under the terms of the Sedo User Agreement, and as a matter of common sense, only the
highest bidder at the end of the auction period could win the authorization code for a domain
name.  (Priesner Decl. Ex. A §5.1.2.4.)  Plaintiff was not the highest bidder at the end of the
auction period for any of the five authorization codes at issue, regardless of whether the auction
is deemed to have ended at 12 p.m. – the initially scheduled end of the auction unless extended
by bids in the last five minutes – or at 3pm, when the continued auction period ended.

On December 24, 2006, when he registered to use the services provided on Sedo's
website, Plaintiff confirmed that he had read the Sedo User Agreement and accepted its terms,
thereby entering a binding contract under which the terms of that agreement governed the
auction.[5/]  *See Forrest v. Verizon Commc'ns, Inc.*, 805 A.2d 1007, 1011 (D.C. Ct. App. 2002)
("A contract is no less a contract simply because it is entered into via a computer").[6/]  *See also
Caspi v. Microsoft Network, LLC*,  732 A.2d 528, 530 (N.J. App. Div. 1999) (enforcing online
agreement to which prospective members had to agree to prior to registration for services).

The Sedo User Agreement provides that a contract could form only with "the prospective
Buyer who placed the highest bid as reflected at the end of the Auction Period."  (*See* Exh. A to
Priesner Decl. §5.1.2.4).  The Sedo User Agreement further provides that the auction will
"generally" end after seven days; however, "upon approaching the close of the seventh day, the

---

[5/]      The Preamble to the User Agreement provided that:  "This Agreement contains the terms and conditions
("T&C") applicable to your use of our services ("Service" or "Services") available under or through the domain,
sub-domains, and affiliated domains of www.sedo.com (collectively, the "Site") and the general principles for the
web sites of our international affiliates. IF YOU ("YOU" OR "USER") DO NOT AGREE TO BE BOUND BY
THE TERMS AND CONDITIONS OF THIS AGREEMENT, DO NOT USE OR ACCESS OUR SITE OR
SERVICES."  (Priesner Decl. Ex. A.)

[6/]      Plaintiff only cites District of Columbia law in his Motion; however, the terms of the Sedo User Agreement
are governed by the laws of the Commonwealth of Massachusetts. (*See* Ex. A to Priesner Decl. § 9.)  The Court
need not resolve the choice of law issue for this motion, however, since mTLD should prevail under either law.

Auction Period will extend for ten minutes each time a valid offer is placed within the last five minutes of the Auction Period."  (*Id.* § 5.1.2.3.)   This contract is binding upon the Plaintiff.[7]

Plaintiff was *not* the highest bidder at the end of the Auction Period, under any conceivable theory.

*First*,  Plaintiff was not the highest bidder at 12 p.m. on December 5, 2007, when the auction was scheduled to end unless extended by bids within the last five minutes.  (Priesner Decl. ¶ 26.)   As explained above, the server outage that occurred towards the end of the initial auction period prevented the regular update of Sedo's website, which continued to display only those bids received before the server outage; however, this outage did not prevent bidders from continuing to place bids through Sedo's website, and these bids were received and captured in Sedo's web server logs.  (*Id.*).   By 12:00 p.m., Sedo had received bids that were higher than the bids placed by Plaintiff for each of the authorization codes at issue here:

- As to video.mobi, Mr. Chmiel's last bid, placed at 11:49 a.m, was for $11,000.  But another bidder submitted a bid for $20,000 at 11:58 a.m.  (*See* Priesner Decl. ¶¶ 24, 26.)

- For videos.mobi, Mr. Chmiel's last bid, placed at 11:43a.m., was for $15,500.  But another bidder placed a bid for $40,000 at 11:56 a.m.  (*See id.* ¶¶ 24, 26.)

- As to sports.mobi, Mr. Chmiel's last bid, placed at 11:37a.m., was for $31,000 However, another bidder submitted a bid for $36,000 at 11:59 a.m.  (*See id.* ¶¶ 24, 26.)

- For photos.mobi, Mr. Chmiel's last bid, placed at 11:53a.m., was for $6,350.  But another bidder placed a bid for $12,500 at 11:59 a.m.  (*See id.* ¶¶ 24, 26.)

---

[7]    In his brief, Plaintiff does not mention the Sedo User Agreement or dotMobi End User Agreement, and instead cites D.C. Code 28:2-328 for the proposition that at an auction a binding acceptance is given in the "customary manner."  However, this D.C. Code provision is inapplicable here (it is modeled on a provision in the Uniform Commercial Code and applies only to sales of "goods", not intangibles such as domain name codes) and even if it did apply it would not release him from his contractual obligations.  Under the U.C.C. and common law alike, it is clear that parties may establish binding rules to govern an auction, either by posting terms or otherwise entering an agreement.  *See* Restatement (2d) Contracts § 28; Comment a. U.C.C. § 1-302 [Rev]; U.C.C. §§ 1-102, 2-328.  An agreement was in place to govern this auction, and *it* controls the outcome rather than any "custom".

- Finally, with respect to photo.mobi, Mr. Chmiel's last bid, placed at 11:43a.m., was for $6,100. But, at 11:58 a.m., another bidder placed a bid for $6,250. (*See id.* ¶¶ 24, 26.)[8/]

*Second*, even if Plaintiff had placed the highest bids for any of the five disputed authorization codes as of 12p.m., he would not have been the highest bidder "at the end of the Auction Period." Under Section 5.1.2.3 of the Sedo User Agreement, "the Auction Period *will* extend for ten minutes each time a valid offer is placed within the last five minutes of the Auction Period." (Priesner Decl. Ex. A §5.1.2.3.) (emphasis added). This rule was no mere technicality; it was fundamental to the fairness of the auction because it ensured that all of the bidders would have an equal chance to respond to others' bids. In the present case, new bids were in fact placed during the relevant five minutes – 11:55 a.m. to 12 p.m. – for each of the domain name authorization codes at issue, thus triggering extensions of these auctions. (*Id.* ¶ 26.) Accordingly, 12 p.m. was not in fact the end of the Auction Period, and even if Plaintiff could establish that he was the highest bidder at that time (and he cannot), he would not have been the highest bidder "at the end of the Auction Period."

*Third*, Plaintiff was not the highest bidder for the authorization codes for any of the five domain names at issue at the end of the Auction Period later that afternoon after Sedo had continued the auction once the servers were fixed. (Priesner Decl. ¶42.) Indeed, as set forth

---

[8/]      As noted above, Plaintiff had given Sedo his proxy to bid on the authorization codes for two of the codes at issue (up to $10,000 for photo.mobi and up to $40,000 for sports.mobi). Had Sedo's computer placed those proxy bids on behalf of Plaintiff, they would have been higher than the last bids for those codes prior to 12 p.m., but Sedo's system did not do so due to the same server issues that affected the auction generally. (Priesner Decl. ¶ 25.) Plaintiff is not entitled to assume what would have happened in the absence of the server crash when that is to his benefit, while ignoring the fact that without the server crash, the erroneous notifications that he was the "winner" would never have been sent. That is particularly true because other bidders had no opportunity to respond to Plaintiff's proxy bids – an opportunity they would have had absent the server crash since those bids would have been placed in the last five minutes, resulting in at least a 10 minute extension of the auction. Indeed, there is every reason to believe that other bidders would have bid much higher than Plaintiff's proxy bids: another bidder placed a bid for $51,000 for sports.mobi at 12:01 p.m., and when the auction continued later that afternoon, the winning bids were substantially above Plaintiff's proxy amounts -- $19,500 for photo.mobi and $101,000 for sports.mobi.

above, *see* supra pp. 8-10, in three of the cases, Plaintiff's highest bid was less than half of the highest bid overall.

Accordingly, regardless of when the auction for each authorization code is deemed to have ended, there is no scenario under which Plaintiff could establish that he was the "highest bidder at the end of the Auction Period" for any of the authorization codes at issue.  Thus, under the governing terms, Plaintiff did not win any of the codes and no contract was formed.

> **2.      Even If Plaintiff Had Been the Highest Bidder at the End of the Auction Period, mTLD Exercised Its Right to Reject Plaintiff's Bids and Precluded Formation of a Contract with Plaintiff**

Even if Plaintiff had been the highest bidder at the end of the Auction Period – which he was not – he would not be entitled to the authorization codes for the domain names at issue. Under the published terms and conditions of the dotMobi End User Agreement, which supplemented the Sedo User Agreement, mTLD reserved the right to reject "any and all bids, for any reason," which it was entitled to do even after the auctioneer accepted a bid.  In light of the technical issues with the auction and resulting complaints from bidders, mTLD exercised this right as to all bids in the auction at issue, including those of Plaintiff.  (*See* Greer Decl. Ex. B ¶5.)  As a result, no contract could have formed with Plaintiff.

It is well established that a seller may place terms and conditions on an auction by publishing them beforehand.  Bidders – particularly sophisticated, repeat bidders such as Plaintiff – are bound by such terms if they knew of the terms, or if they should have known of them.  *See*, *e.g.*, *Hessel v. Christie*, 399 F. Supp. 2d 506, 516 (S.D.N.Y. 2005) (bidders are bound by posted terms they should have ascertained even if they are not subjectively aware of those terms); *Young v. Hefton*, 173 P.3d 671, 676 (Kan. App. 2007) (terms of sale announced at an auction are binding on bidders, even if the terms were not brought to the bidders' actual attention).  *See also*

1 *Williston on Contracts* § 4:12 (4th ed.) (analogizing the duty to ascertain the terms of an auction before bidding to the duty to read a contract before executing it).

Among the terms and conditions that a seller may place on an auction is one that permits the seller to reject a bid for any reason, even after an auctioneer has accepted a bid.  Where a seller reserves its right to reject any bids, *only* the seller can give a valid acceptance.  Action by the auctioneer – even the traditional hammer fall – does not create a contract.  *See, e.g.*, *Cuba v. Resolution Trust Corp.*, 849 F. Supp. 793, 797-98 (N.D. Ga. 1994) ("Where the seller reserves the right to refuse to accept any bid made, a binding sale is not consummated between the seller and the bidder until the seller accepts the bid; *Eugene Stud & Veneer, Inc. v. State Board of Forestry*, 469 P.2d 635, 636-37 (Or. Ct. App. 1970) (seller who reserved right "to reject any or all bids" entitled to reject high bid six days after an auction even after bidder tendered deposit); *Lawrence Paper Co. v. Rosen & Co., Inc.*, 939 F.2d 376, 379 (6th Cir. 1991) (right to reject "may be exercised by the owner even after the auctioneer has accepted a bid") (quoting 7 Am. Jur. 2d Auctions and Auctioneers § 16, p. 375).

In the auction at issue here, mTLD reserved the right "to reject a bid from any Participant for any reason" under the dotMobi End User Agreement, whose terms Plaintiff knew or should have known.  When mTLD announced the third auction for the authorization codes for dotMobi domain names in the Fall of 2007, it advised potential bidders that "[t]he auction rules will follow Sedo's standard Terms and Conditions," subject to certain conditions set by dotMobi. (*See* Pls. Br., Ex. 1, 21.)  mTLD published its auction announcement and the dotMobi End User Agreement on its website, on a page dedicated to the auction, alongside a description of the auction and the catalog of domain name authorization codes being offered.  This page advised

- 18 -

prospective buyers that by participating in the online auction," they would "agree to the .mobi

Auction End User Agreement," and provided a link to the agreement, in plain view.  (*Id.*)

Sedo, the auction manager, also issued several press releases to inform prospective

buyers that "[f]ull information" regarding the auction "is located on the dotMobi website," and

providing a link to mTLD's website.  (*See* Pl's. Br., Ex. 3.) ("Full information, including the list

of auction names, is located on the dotMobi web site at http://premiumauction.mobi").  Plaintiff

attaches a copy of both the mTLD auction page and one of Sedo's press releases to his brief, as

attachments 2 and 3, and it would be surprising if he did not visit the site prior to the auction.

(*See id.*; Pl's. Br., Ex. 1, 21.)[9/]  However, even if he did not, his failure to do so would not save

him.  When a seller publishes its terms, and its auctioneer issues press releases explaining where

they may be found, a sophisticated bidder like Plaintiff is not entitled to avoid the terms by

contending he did not bother to consult them.  *See Hessel v. Christie*, 399 F. Supp. 2d at 516.[10/]

As noted above, after mTLD received complaints from bidders about the December 5

auction and the confusion that it created, it exercised its right under the dotMobi End User

Agreement to reject all bids placed during the third .mobi auction, including Plaintiff's bids, and

thereby precluded the formation of any contract with Plaintiff.  (*See* Greer Decl. ¶ 15.)

### 3.    Plaintiff's Contract Claim Fails Because He Knew the Notifications He Received Were Mistaken

Plaintiff rests entirely on the contention that the automated notifications erroneously sent

by Sedo's computer constituted "acceptance" of his bid and resulted in a binding contract.  In

---

[9/]    It is telling that Plaintiff has attached these materials.  When Plaintiff sought authoritative evidence of the terms and conditions of the auction to present in his Motion, he visited the mTLD website.  A reasonable bidder would have done the same before placing bids worth tens of thousands of dollars.

[10/]    Furthermore, mTLD understands that the Sedo auction interface was programmed to require bidders to affirmatively consent to the terms and conditions of the dotMobi End User Agreement before being able to place a bid in the Sedo auctions.  Although mTLD does not yet have complete information, it may be able to demonstrate that Plaintiff affirmatively assented to the terms of the dot Mobi End User Agreement in one or more of the Sedo auctions as the case progresses further.

doing so, Plaintiff ignores entirely the governing rules of the auction under which no contract could form unless, among other things, he was the highest bidder at the end of the Auction Period for an authorization code and his bids were not rejected by mTLD.  Even if he could overcome these obstacles and establish that the automated notifications resulted in a contract – which he cannot – he still could not prevail because those notifications were predicated on a material mistake, and Plaintiff knew, or had at least reason to know, of that mistake.

Where a party to a contract is mistaken as to a basic and material assumption on which it made the contract, and the other party knew or had reason to know of the mistake, the mistaken party may void the contract so long as it did not bear the risk of the mistake.  Restat. 2d of Contracts § 153; *Flippo Constr. Co. v. Mike Parks Diving Corp.*, 531 A.2d 263, 272 (D.C. 1987) (adopting the Restatement approach to unilateral mistake); *Zysk v. Baker*, No. 2005-0003, 2006 WL 4121711 (Mass. Super. Dec. 11, 2006) (adopting Restatement approach and citing *Polaroid Corp. v. Travelers Indem. Co.*, 414 Mass. 747, 756 (1993)).

In contract law, a mistake is a "belief that is not in accord with the facts."  Restat. 2d of Contracts § 151.  A mistake is material if the result on the agreed exchange of performances "is not only less desirable to [the adversely affected party] but is also more advantageous to the other party."  Restat. 2d of Contracts § 152, cmt. c.  In other words, "the other party will give, and the adversely affected party will receive, something less than they supposed."  *Id.*

Here, the mistake is plain and material.  One of Sedo's automated systems, due to a system outage and in conflict with demonstrable facts, erroneously operated as if the auction had ended and Plaintiff had been the highest bidder.  Because of these mistakes about two fundamental facts, Plaintiff hopes to gain the authorization codes for the five names at a small fraction of what was bid for them in the auction – less than 30 percent – and mTLD stands to

lose a corresponding amount. The change in the parties' expectations far exceeds those held "material" by courts adopting the Restatement's approach. *See, e.g.*, *Donovan v. RRL Corp.*, 26 Cal. 4th 261, 282 (2001) (thirty-two percent difference in value of contract is material); *Hillside Ass'n of Hollis v. Maine Bonding & Casualty Co.*, 135 N.H. 325, 333 (1992) (fifty percent higher level of insurance coverage is material); *Elsinore Union Elementary School Dist. v. Kastorff*, 54 Cal. 2d 380, 389 (1960) (seven percent difference in contract price is material).[11/]

Further, Plaintiff clearly knew, or at least had reason to know, that the notifications he received informing him that he was the apparent highest bidder were premised on one or more fundamental mistakes. First, five to ten minutes before noon, the auction websites stopped posting new high bids, and none of the auctions in which Plaintiff was bidding was extended. (Priesner Decl. ¶ 18.) This would have been a surprising development to anyone familiar with prior .mobi domain auctions (as Plaintiff was, having participated in the first two auctions) or, indeed, with auctions generally, since high bids are typically received toward the end of a timed auction. (*Id.* ¶ 21.) Second, due to the server failure, the bidding appeared to have stopped at prices that were a fraction of the codes' market value, or, it appears, the value that Plaintiff attached to them. At noon, for example, the highest bid visible for photos.mobi was $6,100. (*Id.* ¶ 24.) Three hours later, after the auction continued, Plaintiff was bidding $50,000 for that same code. (*Id.* ¶ 37.) Any reasonable person with familiarity of .mobi domain names (Plaintiff is the registrant of 400 such names) and the auction process had reason to know that the apparent premature cessation of bidding at levels well below market value must have meant that

---

[11/]    mTLD did not bear the risk of this mistake. The auction terms do not allocate the risk of any mistake to mTLD, *cf.* Restat. (2d) of Contracts §§ 153, 154 cmt. b, and mTLD was not aware of facts relating to the mistakes at the time the erroneous notifications were sent, *cf. id.* § 154 cmt. c. Nor would it otherwise be reasonable to allocate the risk to mTLD. *See id.* cmt. d. mTLD engaged a leading and reputable auction house, which suffered an unanticipated computer failure as the result of an unprecedented surge of interest in the auction. mTLD and Sedo then took steps to rectify the error immediately. Indeed, not even Plaintiff has claimed that he altered his position in reliance on the mistake, nor could he.

- 21 -

legitimate bids were not being reflected and that the auctions were improperly considered closed. Third, even if any doubt remained about whether the automatic notifications had been sent in error, such doubt was definitively resolved within minutes by the follow-up notices that Sedo and mTLD sent explaining that the auction was not complete and that the prior notifications had been sent in error. (*See* Pl.'s Br. Ex. 15-18.)

Finally, Plaintiff's own actions demonstrate that he knew the notifications sent by Sedo were a mistake and that the auction was continuing. Plaintiff continued to actively bid when the auction resumed in the afternoon. If Plaintiff seriously believed that he already had formed a valid contract to purchase the codes for the five names at issue, subsequent bidding for those codes during the continued auction would have been unnecessary and fruitless, yet Plaintiff later placed a bid more than double his supposed "winning" bid for one of the names at issue and another bid almost eight times higher than his supposed "winning" bid for another name. (Priesner Decl. ¶¶ 24, 36-40.) Moreover, Plaintiff placed bids for authorization codes for *other* domain names – if he really believed that the auction had ended at noon, that too would have been fruitless since he would expect that other bidders had formed valid contracts for those codes.

Essentially, Plaintiff is now trying to take advantage of an obvious computer failure to obtain a windfall – valuable domain name authorization codes at a fraction of their value. He knew or had reason to know of the failure, and indeed participated in the bidding following the resumption of the auction. Plaintiff's situation is no different from that of a customer who tries to cash a refund check that was mistakenly printed with an extra zero, or a contractor who tries to force a subcontractor to honor a bid where the subcontractor failed to factor in a major cost. *See, e.g., M. F. Kemper Const. Co. v. City of L.A.,* 37 Cal. 2d 696 (1951) (contractor permitted to

- 22 -

rescind binding bid when it discovered failure to include item that would cause 30 percent increase in cost of performance).  Under circumstances such as these, mTLD clearly would be entitled to void a contract even if one had formed.

### C.    Plaintiff Has Not Shown that He Will Be Irreparably Harmed If an Injunction Does Not Issue

Although Plaintiff contends that he would be irreparably harmed if he were not able to obtain the authorization codes for the five domain names at issue, all of the evidence is that he sought these codes for commercial reasons and that, even if he could establish liability, any injury he may have suffered could be adequately compensated by an award of money damages.

Harm is "irreparable" for purposes of obtaining a preliminary injunction only when "adequate compensatory or other corrective relief" may not be "available at a later date, in the ordinary course of litigation."  *Southland Co. v. Godette*, 793 F. Supp. 348, 352 (D.D.C. 1992) (emphasis in original) (quoting *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958)).  Where a defendant's solvency is not at issue, a plaintiff must show that money damages would be inadequate or incalculable.  *Id.*  But where a party's interest in property is "at bottom" economic, the requisite harm is not shown and relief should be denied. *Southland Co.*, 793 F. Supp. at 352.

A party may make the necessary showing if he can establish that he would be entitled to specific performance, as this doctrine also requires a showing that damages would be inadequate or incalculable.  *Clay v. Faison*, 583 A.2d 1388 (D.C. 1990).  This is precisely Plaintiff's theory. (Pl.'s Br. 4.)  However, specific performance is an "extraordinary equitable remedy" that is infrequently granted, and Plaintiff cannot meet his burden of showing it should be granted here. *Hussain v. Cameron Const. and Roofing Co.*, 2007 WL 824224, at *1 (Mass. App. Div. March 14, 2007); *Kakaes v. George Washington University*, 790 A.2d 581 (D.C. 2002) (same).

The evidence in this case is that the only injury Plaintiff suffered, if any, is a lost opportunity to add a few largely fungible domain-name registrations to his inventory. Plaintiff is in the domain-name business. He is the registrant of over 400 ".mobi" top-level domain names, which he uses to generate income in various ways, such as renting them to website developers, offering them for sale, and earning fees by referring visitors to other web sites. (*See* Greer Decl. ¶¶ 4-6; List of Paul Chmiel's Domain Names, attached as Exhibit A to Greer Decl.) Plaintiff does not claim any personal attachment to the domain names whose registrations are at issue in this litigation, nor could he credibly do so – the names are generic and they fall into disparate categories ("sports," "photos," "videos"). Nor has Plaintiff identified any unique value that these names have to his business. He has not shown that other names would not serve him just as well, or that without these particular names he will be unable to pursue a particular line of business.[12] The authorization codes can be appraised to derive their fair-market value, and Plaintiff's injuries, if any, can be fully compensated at the end of litigation with money damages. (*Cf.* Amd. Comp. § 28 (stating that the "fair market value" of domain name authorization codes can be derived from an auction).)

Plaintiff nevertheless contends that an injunction should issue because each of these names is different. But nearly any two things are different in some respect; Plaintiff has not shown, as he must, that the codes at issue have some unique quality that would make money damages or other performance inadequate substitutes. It bears emphasis that Plaintiff, as the party seeking an injunction, bears the burden of production and persuasion. He cannot carry this burden simply by asserting, without competent evidence – of which Plaintiff has provided none –

---

[12]    Nor could he do so. Just a brief examination of websites in the .com top-level domain demonstrates that the names at issue here are not unique in value or necessary to pursue a particular type of site. For example, the leading site for videos in the .com top-level domain is youtube.com, not video.com or videos.com.

that "nothing else in the world, particularly money, is sufficient to redress the loss" of the authorization codes at issue here.  (Pl.'s Br. 4)  *See, e.g.*, *Medgar Evers Houses Assocs. v. Carro*, No. 01-CV-6107, 2001 WL 1456190,  at *5 (E.D.N.Y. Nov. 6, 2001) (Plaintiff's unsupported assertion that the value of property being litigated "c[ould] not be measured and recovered by an award of monetary damages" was insufficient to show irreparable harm ).

Plaintiff claims that the authorization codes at issue in this case are "highly similar to land," and cites *Independence Mgmt. Co. v. Anderson & Summers*, LLC, 874 A.2d 862 (D.C. 2005), but the analogy is attenuated at best and does not help him.  (Pl. Mot. 4.)  As is well known, courts have long afforded realty a special status where specific performance or irreparable harm is at issue, *see JOGO Assocs. v. United States Dep't of Hous. & Urban Dev.*, No. 92-2451 (NHJ), slip op. at 4-6 (D.D.C. Nov. 25, 1992) (attached hereto as Appendix 1), and it is hazardous to generalize from real property cases to cases involving other kinds of rights or property.  Indeed, the *Independence Mgmt. Co.* court simply "presumed" that the realty at issue was unique – without analysis or explanation – and the parties appear not to have litigated the question.  *See Independence Mgmt*, 874 A.2d at 870.  No similar presumption operates where domain name registrations are at issue.

Moreover, even where real property is at issue, the general rule applies that irreparable harm is shown only where money damages would be inadequate.  Thus, courts have held that irreparable harm is not shown where realty is sought for commercial purposes, rather than for personal or sentimental reasons, and the movant has not established that the property has unique value to him or her.  *See, e.g.*, *JOGO Assocs.*, No. 92-2451, at 4-6 (movant had not shown irreparable harm where its "interest in [the disputed real property] is purely commercial," and "[t]he greatest possible harm that [it] could suffer upon losing the property, therefore, is financial

- 25 -

loss."); *Medgar Evers Houses Assocs.,* 2001 WL 1456190, at *5 (no irreparable harm where

Plaintiff did not claim "sentimental or personal attachment to the houses or that the project

possesses any other characteristics that render it uniquely valuable", and where the principle

value of the sites lay in the tax benefits they generated). Like these commercial landowners,

Plaintiff has not shown that the authorization codes for the names at issue have a special value *to*

*him* for which an award of money damages is insufficient, and he has not shown that no other

substitutes are available.

Because Plaintiff has not carried his burden of demonstrating that he is likely to suffer

irreparable harm, the motion for a preliminary injunction should be denied. *See CityFed Fin.*

*Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995) (failure to show

irreparable harm alone was sufficient to deny motion for preliminary injunction).

### D.    A Preliminary Injunction Would Harm Other Interested Parties and the Balance of Harms Does Not Favor Plaintiff

Plaintiff argues that the balance of harms weighs in favor of a preliminary injunction

because the harms to him from a transfer of the codes allegedly would be serious and irreparable,

while Sedo and mTLD would not be seriously harmed because they could sell the authorization

codes later, if they prevail at trial. This is wrong on both counts.

*First*, as noted above, Plaintiff has shown no cognizable harm. He was not the highest

bidder in the auction, and under the rules governing the auction he is not entitled to the

authorization codes. Even assuming he could prevail at trial, which he could not, he could be

fully compensated by an award of money damages. These failings *alone* mean that he is not

entitled to a preliminary injunction. A preliminary injunction is an "extraordinary measure,"

*Cobell*, 391 F.3d at 258, available only where the likelihood of damages and irreparable injury

are clearly shown – even if the putative injury to others from the injunction would be slight.

- 26 -

*Second*, an injunction in this case would harm mTLD, Sedo, and third parties. Sedo and mTLD would be bound to hold inventory for an indefinite period of time whose fair market value has now been established at auction to be nearly $250,000. They would also suffer from a court decision that created doubts about their ability to transfer valid authorization codes at an auction. Although Plaintiff seeks to minimize these harms, they are substantial and sure to occur if a preliminary injunction issues.

Plaintiff entirely ignores the harm an injunction would cause to other bidders. An injunction would harm parties with an interest in buying the rights to use the names at issue, because they would be unable to do so until the injunction dissolved. Indeed, it is precisely to frustrate these prospective buyers – who have already shown through their higher bids that the names are more valuable to them than to Plaintiff – that Plaintiff is seeking an injunction.

A preliminary injunction also would cloud the rights of Mr. Columbani, the highest bidder for the video.mobi authorization code, and interfere with his ability to develop products and services for the pendency of the preliminary injunction – even though his claim to the registration rights is superior to that of Plaintiff because he was the highest bidder at the end of the auction. Plaintiff insinuates that the transfer of the video.mobi code to Mr. Colombani after the filing of this suit was somehow improper. (Pl.'s Br. 5.) That assertion has no merit. At the time of that transfer, Plaintiff had not even moved for, let alone obtained, a preliminary injunction or temporary restraining order, even though almost one month had passed since the filing of his complaint (which itself had not mentioned a TRO or other preliminary relief). Plaintiff's position appears to be that the mere filing of his complaint should have operated as an injunction on defendants transferring the authorization codes for the names at issue, but that obviously is incorrect, as Plaintiff appears to have recognized by filing this motion.

- 27 -

Because Plaintiff has shown no likelihood that he is the rightful owner of the names, or that if he somehow prevailed he could not be adequately compensated by money damages, while both defendants and third parties would be harmed by an injunction, the balance of harms weighs clearly against issuance of such an injunction.

### E.    The Public Interest Does Not Weigh in Favor of a Preliminary Injunction

Plaintiff groundlessly argues that a preliminary injunction would safeguard the public's interest in the proper conduct of auctions and in the award of internet domain names to the most productive users. His arguments about the conduct of auctions are derivative of his arguments on the merits of his claim, and they fail for the same reasons. His argument that he would be the most productive user of the codes at issue is wholly unsupported by competent evidence, and indeed is contradicted by the fact that others were willing to pay far more for the codes – presumably because they intended to put the codes to more productive uses.

The only case that Plaintiff cites in purported support of his position is *Mooring Tax Asset Group, LLC v. Marks*, No. 03-CA-5830, 2005 WL 1140448, at *2 (D.C. Super. Ct. May 10, 2005), which is entirely unhelpful. In that case, the court granted a preliminary injunction to prevent a transfer of property where the movant had shown it was "virtually certain" that the transfer would be unlawful. *Mooring*, 2005 WL 1140448 at *2 (granting injunction to ensure that claimant to a house who was relying on a note allegedly signed by the owner two years *after* the owner had died did not obtain title). It is not "virtually certain" that Plaintiff in this case will prevail – far from it – and there is no public interest in awarding him a preliminary injunction that would frustrate lawful transfers and interfere with the rights of others such as Mr. Columbani. *Cf. Hubbard v. United States*, 496 F. Supp. 2d 194, 203 (D.D.C. 2007) ("It is in the public interest to *deny* injunctive relief when the relief is not likely deserved under law.") (quoting *Qualls*, 357 F. Supp. 2d at 287) (emphasis added, internal brackets deleted).

- 28 -

## III.    PLAINTIFF IS NOT ENTITLED TO EXPEDITED DISCOVERY

Finally, Plaintiff argues that if his present submission does not clearly show that a preliminary injunction should issue, the Court should order an expedited round of discovery so he can amend his submission and refile.  (Pl.'s. Br. 10.)  He is not entitled to this relief.

Although courts differ in their manner of formulating the test, it is clear that expedited discovery is available only in "limited circumstances," where the party seeking relief shows good cause for departing from the ordinary time limits and procedures set forth in the Federal Rules of Civil Procedure.  *See Disability Rights Council of Greater Washington v. Washington Metropolitan Area Transit Authority*, 234 F.R.D. 4, 6 (D.D.C. 2006) (setting forth tests that courts have applied).  Upon that showing, the party may be entitled to discovery that is narrowly tailored to resolve the specific questions the party has raised.

Plaintiff's request should be rejected because the evidence already before the Court makes clear that he is not entitled to a preliminary injunction – he cannot show that he is substantially likely to prevail on the merits, or that he would suffer irreparable harm if no injunction issued while his claims are adjudicated on the merits.  Plaintiff does not even attempt to identify additional information that would assist the Court in resolving his motion – he simply states a desire for any evidence that would be relevant to his motion, a standard that would require *all* discovery in the case to be expedited since any discovery going to his likelihood of success on the merits or entitlement to specific performance could be relevant to this motion.  (Pl.'s Br. 11.)  Plaintiff does not show, as the cases require, that the scope of expedited discovery he has requested is clearly defined, is tailored to his legitimate needs, and shows sufficient concerns for the burdens his extraordinary request would place on opposing parties.  *See*, *e.g.*, *Disability Rights Council*, 234 F.R.D. at 6-7; *Philadelphia Newspapers, Inc. v. Gannett Satellite*

- 29 -

*Information Network, Inc.*, No. 98-CV-2782, 1998 WL 404820, at *3 (E.D. Pa. July 15, 1998).[13]

In sum, he is requesting a departure from the rules without offering justification or clear

limitations.

 The sole decision on which Plaintiff rests, *Optic-Electronic Corp. v. United States*, 683 F.

Supp. 269, 270 (D.D.C. 1987), is inapposite.  In *Optic-Electronic*, the court ordered expedited

discovery because Plaintiff had made a strong preliminary showing on the merits – much of it

"unchallenged" by the defendant – and sought carefully tailored discovery in a context where

expedited discovery was "in the best interest of *all* parties."  *Id.* 271 (emphasis added).  Here, it

is already clear that Plaintiff is not entitled to a preliminary injunction, and he has not explained

what further information would be helpful to him or the Court.  Allowing expedited discovery

would only add, for no good reason, to the burden and expense of this litigation, and Plaintiff's

request should therefore be denied.

## CONCLUSION

 For the foregoing reasons, Defendant mTLD respectfully requests that this Court deny

Plaintiff's motion for a temporary restraining order, preliminary injunction or, in the alternative,

expedited discovery.

---

[13] For example, although Plaintiff has not proposed any timetable for his own requests, he asks the Court to order that Defendants – whose principal places of business are abroad – respond to his requests within "five calendar days."  This kind of request, absent clear and compelling justification, is precisely the kind of request courts routinely reject.  *See, e.g., Philadelphia Newspapers,* 1998 WL 404820 at *3 (denying request for five-day deadline on written discovery); *Société Nationale Industrielle Aérospatiale v. United States*, 482 U.S. 522, 546, 107 S.Ct. 2542, 2557 ("American courts, in supervising pretrial proceedings, should exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position").

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| PAUL CHMIEL, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 1:08-cv-00365 (HHK) |
| | ) | |
| v. | ) | |
| | ) | |
| SEDO.COM, LLC *et al*., | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

**[PROPOSED] ORDER**

Upon consideration of Plaintiff Paul Chmiel's Motion for Temporary Restraining Order, Preliminary Injunction and Expedited Discovery and the memoranda in support of and opposing the Motion, it is hereby **ORDERED** that Plaintiff's Motion is **DENIED**.

This _____ day of March, 2008

_____
The Honorable Henry H. Kennedy
United States District Judge

Dated: March 20, 2008                              Respectfully submitted,


                                                   /s/ Samir Jain
                                                   Samir Jain (D.C. Bar No. 456090)
                                                   Kathryn C. Arnold (D.C. Bar No. 483173)
                                                   WILMER CUTLER PICKERING HALE &
                                                        DORR LLP
                                                   1875 Pennsylvania Ave. N.W.
                                                   Washington, D.C. 20006
                                                   202-663-6000 (telephone)
                                                   202-663-6363 (facsimile)
                                                   Samir.Jain@wilmerhale.com


                                                   *Counsel for Defendant mTLD, Ltd.*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 20th day of March, 2008, a copy of the foregoing

Proposed Order as to Plaintiff's Amended Motion for Temporary Restraining Order, Preliminary

Injunction and Expedited Discovery was filed electronically with the Clerk of the Court.  The

electronic filing prompted automatic service of the filing to all counsel of record in this case who

have obtained CM/ECF passwords.


/s/ Kathryn C. Arnold

# Appendix 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOGO ASSOCIATES,

        Plaintiff,

        v.

UNITED STATES DEPARTMENT
OF HOUSING AND URBAN
DEVELOPMENT, et al.,

        Defendants.

Civil Action No. 92-2451 (NHJ)

FILED

NOV 25 1992

Clerk, U.S. District Court
District of Columbia

### MEMORANDUM AND ORDER

    The plaintiff in this case, JOGO Associates, is a California partnership that owns the Old Mill Stream housing project in Irving, Texas.  Constructed in the early 1970s, Old Mill Stream consists of rental units for low- and moderate-income families. Because of a default on the mortgage, HUD paid the original lender's mortgage insurance claim and became the holder of the mortgage secured by Old Mill Stream.  JOGO Associates acquired Old Mill Stream in 1978, and has been in default on the mortgage for many years.  The arrearage now amounts to at least $2.8 million, and no payments have been made on the principal of the loan since 1976.  Additionally, the project is in serious need of repairs.

    This litigation has arisen as a result of HUD's decision to foreclose on Old Mill Stream.  On June 12, 1992, JOGO learned that HUD intended to initiate foreclosure proceedings on the project immediately.  JOGO prepared a proposed workout agreement, which it submitted to HUD on September 10, and which HUD's Dallas Office rejected on September 14.  One month later, on October 14, JOGO

filed an appeal with the HUD Regional Office in Fort Worth. HUD denied this appeal on October 26, and informed JOGO that it intended to proceed with foreclosure. HUD originally intended to conduct the foreclosure sale on November 3, 1992, but recently postponed the sale until November 27. The parties agree that it is highly likely that HUD itself will be the only bidder at the sale. JOGO brought this action to enjoin the sale on October 30 and filed its motion for a preliminary injunction on November 11. The extraordinary relief sought in this case must be denied for the reasons that follow.

## DISCUSSION

A preliminary injunction is an extraordinary equitable remedy that may be granted only upon a clear showing of entitlement. In order to obtain preliminary injunctive relief, a plaintiff must demonstrate:

(1) a strong showing that the plaintiff is likely to prevail on the merits,

(2) that the plaintiff will suffer irreparable injury if injunctive relief is not granted,

(3) that an injunction would not substantially harm other interested parties, and

(4) that an injunction would not significantly harm the public interest.

Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n, 259 F.2d 921, 925 (D.C. Cir. 1958). Because analysis of the first two of these factors disposes of plaintiff's motion, the Court considers here only whether JOGO has demonstrated that it has a substantial

likelihood of success on the merits and will suffer irreparable harm if it does not obtain injunctive relief.

## 1. Irreparable Harm

The Court confronts the issue of irreparable harm first. JOGO bears the burden of proving that the injury it will suffer is "both certain and great; it must be actual and not theoretical." Wisconsin Gas Co. v. Federal Energy Regulatory Comm'n, 758 F.2d 669, 674 (D.C. Cir. 1985). Even more important, JOGO must show that the injury will be impossible to correct or redress after it occurs: "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." Virginia Petroleum Jobbers, 259 F.2d at 925.

JOGO has provided three reasons why foreclosure would cause it irreparable harm. JOGO argues (1) that the loss of Old Mill Stream would be irreparable because Old Mill Stream is real property, which equity has historically recognized as unique; (2) that in choosing to proceed by non-judicial foreclosure, HUD has denied JOGO a full opportunity to present its defenses and to conduct discovery regarding HUD's knowledge of Old Mill Stream's deficiencies at the time OGO bought it; and (3) that foreclosure would stain JOGO's reputation and endanger its other investments in public housing.

### A. Uniqueness of Real Property

JOGO argues that "[e]quity has historically recognized the

unique qualities of real property."  This is true, at least insofar
as courts of equity "will ordinarily order specific performance of
an enforceable contract for the sale of land in favor of either
party to the contract."  Roger A. Cunningham et al., The Law of
Property § 1.5 at 15 (1984).  The rationale for this rule is that
"specific performance should be ordered only when the remedy at law
is inadequate," and so because "each parcel of land is unique, and
no other parcel can possibly be an exact substitute for the one the
purchaser bargained to buy . . . damages are inadequate per se."
Id. § 10.5 at 653.

        JOGO cites a single case in support of its argument that
foreclosure upon Old Mill Stream would constitute irreparable
injury.  However, this case, Kent Farm Co. v. Hills, 417 F. Supp.
297, 302 (D.D.C. 1976), merely observed that "it appear[s] that
plaintiff . . . would as a result of the agency's [foreclosure]
action suffer irreparable injury for which there is no adequate
remedy at law."  This statement does not support JOGO's position,
for the court in Kent Farm did not explain why it found that
foreclosure would inflict irreparable injury on the plaintiff.  The
court certainly did not undertake an examination of the proposition
that real property should be presumed to be unique.  Nevertheless,
the Court must recognize that some case law does support JOGO's
position.  See, e.g., Bean v. Independent Am. Sav. Ass'n, 838 F.2d
739, 743 (5th Cir. 1988) ("Because Bean stands to lose interests in
real property, which we presume are unique, there is no adequate
post-foreclosure remedy that could substitute for injunctive
relief.")  The Court nevertheless declines to adopt this blanket

4

presumption, because it ignores the reality of modern commercial real estate transactions.

The idea that each parcel of real estate is necessarily unique developed in agrarian England, and has lost some of its force in modern America:

> Literally, of course, every parcel of real estate _is_ unique, but certain properties are sufficiently similar that the risk of undercompensating the promisee in damages is slight. An obvious example in contemporary society is the mass-produced development house or apartment. When the subject matter of a contract is farmland or timberland, the claim of irreplaceability is equally suspect. Indeed, the fact that the legal system routinely values real estate in condemnation and other proceedings undermines the argument that damages cannot be determined in an action for breach of contract.

Edward Yorio, Contract Enforcement: Specific Performance and Injunctions § 10.1 at 261-62 (1989). Courts have, therefore, slowly come to realize that whether a parcel of land is "unique" should be irrelevant when "the plaintiff's sole concern is not anguish at the thought of losing the impossible-to-duplicate estate, but only to recover expected profits from its resale, lease, hypothecation or other use." 11 Samuel Williston & Walter H.E. Jaeger, A Treatise on the Law of Contracts § 1418B at 686 (3d ed. 1968). Courts have thus refused to grant the remedy of specific performance "when the buyer's purpose in acquiring the property was speculation or investment." Yorio, supra, § 10.2.2 at 265-66; see cases cited at id. n.11.

This judicial recognition that real property is not always "unique" has led many courts to find that parties who sought to enjoin transfers of interests in land did not face irreparable

harm.  The central question, once again, is whether the property is held for personal use or merely for profit.  For example, in Geneva Ltd. Partners v. Kemp, 779 F. Supp. 1237, 1241 (N.D. Cal. 1990), the court observed that

> [w]hile the Court recognizes that real property is often judicially perceived as unique, in this case plaintiffs are faced with the loss of commercial, and not residential, property.  They are thus threatened with an economic loss which is compensable in large part, if not entirely, in damages. . . .  The Court finds that adequate compensatory relief will be available to plaintiffs if they ultimately prevail against HUD on the merits of this litigation.  Accordingly, the possibility of irreparable harm is at best remote.

See also Fish v. Bank Five for Sav., 769 F. Supp. 31, 33 (D.N.H. 1990) ("Although land is generally considered unique as plaintiff contends, the threat of a mortgage foreclosure does not by itself justify the issuance of a preliminary injunction."); Hunt v. Bankers Trust Co., 646 F. Supp. 59, 64 n.5 (N.D. Tex. 1986) ("Movants have argued in their brief that real estate is unique and that foreclosure on each piece of real estate is therefore presumptively irreparable injury . . . .  Both the Texas and federal courts have denied preliminary relief to halt foreclosure of real estate without mention of any such presumption.  Further, the Court finds no authority that supports such a presumption of irreparable injury.").

JOGO has not alleged any peculiar sentimental or personal attachment to Old Mill Stream, nor has it introduced any evidence that might permit the Court to find that the project is somehow "unique" for JOGO.  Instead, JOGO relies solely on the outmoded presumption that all real property is unique, a presumption that

6

the Court rejects as a justification for injunctive relief. JOGO's interest in Old Mill Stream is purely commercial. The greatest possible harm that JOGO could suffer upon losing the property, therefore, is a financial loss. The property itself is fungible. The Court accordingly finds that money damages would be adequate to compensate JOGO for any injury it might suffer as a result of the foreclosure.

### B. Opportunity to Conduct Discovery

JOGO next argues that it will suffer irreparable harm because "[i]f HUD had to petition for a judicial decree of forfeiture -- instead of proceeding by non-judicial foreclosure -- JOGO would have a full opportunity to present its defenses, including the opportunity to engage in discovery, before the Project could be sold." This statement does not, however, explain why it is so vitally important that JOGO conduct its discovery before the project is sold. As has been observed, JOGO has not shown that money damages will be insufficient to compensate it for any loss it may suffer. Even if JOGO suffers harm because of its inability to conduct discovery, this harm will not be irreparable.

### C. Harm to Reputation

At the hearing on this motion, counsel for JOGO asserted that foreclosure on Old Mill Stream would "stain" JOGO's reputation and thereby cause JOGO irreparable harm. This assertion had not appeared in any of JOGO's papers, and JOGO presented no witnesses or other evidence to prove that the harm would indeed occur. In

7

the absence of any proof of harm, counsel's bare assertion is insufficient to justify issuance of an injunction. "Bare allegations of what is likely to occur are of no value since the court must decide whether the harm will <u>in fact</u> occur. The movant must provide proof . . . indicating that the harm is certain to occur in the near future. Further, the movant must show that the alleged harm will directly result from the action which the movant seeks to enjoin." <u>Wisconsin Gas</u>, 758 F.2d at 674. In the absence of any evidence, therefore, the Court need not even consider JOGO's assertion that foreclosure will injure its reputation irreparably.

The Court accordingly finds that JOGO has failed to prove, or even to allege, irreparable harm. This failure alone justifies denial of the motion. However, because the Court also finds that JOGO has failed to prove a substantial likelihood of success on the merits, it proceeds to an examination of the central dispute in this case.

## 2. Likelihood of Success on the Merits

The thrust of JOGO's argument is that HUD has not followed the correct procedures in reaching its decision to foreclose upon Old Mill Stream. Pointing out that the National Housing Act, 12 U.S.C. § 1701z-11(a), requires HUD to pursue its goals "in the least costly fashion among the reasonable alternatives available," JOGO argues that HUD must present a "reasoned analysis of its decision to foreclose." JOGO also claims that HUD deprived JOGO of due process by denying JOGO's appeal of the foreclosure decision.

## A. The Foreclosure Decision

According to JOGO's statement of facts, on September 10, 1992, JOGO submitted to HUD a proposed workout agreement that offered to provide the capital necessary to redress Old Mill Stream's physical and financial difficulties.  Four days later, the HUD Dallas Office rejected the proposed workout because it would increase the mortgage delinquency during the first three years of the workout, and because it did not meet HUD's estimate of Old Mill Stream's repair needs.  JOGO argues that this rejection was "conclusory" and did not address whether JOGO's plan was the "least costly reasonable alternative available to HUD," as required by § 1701z-11(a) of the National Housing Act.  JOGO claims that it "was willing to consider expending whatever additional sums were needed for repairs to the Project," but that HUD never gave JOGO information about HUD's estimated repair costs, even though JOGO repeatedly requested the information.  JOGO concludes that its workout plan is indeed the least expensive alternative available to HUD, because JOGO plans to invest $2 million of its own money in Old Mill Stream, while HUD's acquisition of the project would cause it to lose $7.9 million (the amount of the current mortgage delinquency) while spending $1.4 million on repairs and providing costly rent subsidies.

Case law indicates that HUD's discretion in determining whether to foreclose on a loan is broad.  For example, in United States v. Winthrop Towers, 628 F.2d 1028, 1035-36 (7th Cir. 1980), the court observed that

if agency discretion could be calculated on a scale of 1

to 9, where 1 represents the narrowest and most
constrained discretion and 9 represents unlimited (or
unreviewable) discretion, then HUD's discretion in
foreclosing a mortgage granted, for example, by a large
commercial developer would be somewhere in the area of 7
or 8.  This is because large commercial developers
presumably possess the resources and sophistication to
make agreements they will be able to live with.

Accordingly, judicial review of HUD's decision to foreclose should

be narrowly limited to the question of whether its actions were

"'arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with law.'"  Id. at 1036 (quoting 5 U.S.C.

§ 706(2)(A)).  This is the conclusion reached in a decision upon

which JOGO relies heavily, Kent Farm Co. v. Hills, 417 F. Supp.

297, 302 (D.D.C. 1976), in which Judge Gesell observed that the

decision to foreclose "is largely committed to [HUD's] discretion."

He noted, however, that "significant final agency action should be

documented by a record, preferably contemporaneous, of factors

taken into account in a rational way by the decision maker," and

found that HUD had "failed to observe minimum requirements in this

respect."

HUD has met these minimum requirements in this case.

Assuming, for the sake of argument, that § 1701z-11(a) of the

National Housing Act does indeed require HUD to determine whether

foreclosure on Old Mill Stream is the "least costly" alternative

available, the Court finds that HUD has made such a determination,

and that this determination has a rational basis.  HUD objects to

JOGO's proposed workout agreement because (1) it provides for

increasing the mortgage delinquency over the next three years, (2)

it does not provide for repayment of the $2.8 million arrearage,

but instead proposes that it be recast to principal, (3) the
$600,000 JOGO has offered to escrow for repairs is insufficient,
and (4) the workout proposes that after three years the mortgage be
recast over a forty year amortization period. Def.'s Opp'n to Mot.
for Prelim. Inj. at 31 n.21; Administrative R., Ex. 99.

HUD has acknowledged that the administrative record presented
is not complete. Nevertheless, at this juncture the Court need
only determine whether JOGO has made a "substantial indication of
probable success." Virginia Petroleum Jobbers, 259 F.2d at 925.
Because JOGO has failed to meet its mortgage obligations for so
long, the Court concludes that JOGO will be hard pressed to prove
that HUD's decision to foreclose was arbitrary and capricious.
Furthermore, if § 1701z-11(a) of the National Housing Act does
indeed require HUD to determine whether foreclosure is the "least
costly" alternative available, then the Court is satisfied that HUD
will probably have little difficulty making this showing as well.
JOGO has failed to demonstrate that it is likely to succeed on this
issue.


**B. Due Process**

The Court next addresses the question of whether HUD complied
with its own appeal procedures in deciding to foreclose on Old Mill
Stream. Section 5-1 of HUD's Handbook 4350.1 states that the
Regional HUD Director "[w]ill review all appeals of Field Office
decisions regarding workout proposals." Pl.'s Mot. for Prelim.
Inj. at 10. Parties have thirty days to file appeals of Field
Office decisions, and the Regional Director then has thirty days to

11

rule.  Id.  On September 14, 1992, the Dallas Field Office rejected JOGO's proposed workout agreement.  JOGO appealed to the Fort Worth Regional Office exactly thirty days later, on October 14.  HUD denied JOGO's appeal on October 26.  JOGO claims that HUD's rejection of the appeal is arbitrary and capricious because HUD failed to provide a reasoned analysis of the denial, and that HUD therefore has denied JOGO due process.

Whether an agency decision is sufficiently detailed to constitute a "reasoned analysis" depends upon the facts of the individual case.  Here, HUD clearly explained that JOGO's workout agreement was rejected because the "property has a mortgage delinquency of more than $2.8 million," and because JOGO's proposal "does not bring the mortgage current."  Administrative R., Ex. 104. As JOGO points out in its Reply Memorandum, § 3-8 of the HUD Handbook provides that once a foreclosure commissioner has been appointed, "the mortgagor must make a lump sum payment sufficient to bring the loan current through principal before the Department will consider withdrawing the foreclosure action."  The reasoning behind HUD's decision is therefore obvious and requires no complex analysis: JOGO's plan did not comply with § 3-8, and so it was rejected.  Although the agency's three-sentence denial of JOGO's appeal on October 26, 1992, did not restate this reason, see Administrative R., Ex. 108, the Court nevertheless finds that HUD has created an administrative record of sufficient detail to justify its decision and permit judicial review.  JOGO's claim that it was denied due process because its plan was rejected "summarily and without any analysis or deliberation" is therefore without

merit.

In its Reply Memorandum, JOGO argues that it was somehow denied due process because the agency relied upon § 3-8 in reaching its decision at a time when § 3-8 did not apply because the foreclosure commissioner had not yet been appointed.  The chronology of the events does not support JOGO's argument.  JOGO submitted its proposed workout plan on September 10, 1992, and the plan was rejected on September 14.  HUD's decision rejecting the plan did not mention § 3-8.  See Administrative R., Ex. 99.  The foreclosure commissioner was then appointed on September 21.  See Administrative R., Ex. 102.  JOGO appealed HUD's decision on October 14, and HUD denied the appeal on October 26.  The final agency action thus occurred after the foreclosure commissioner had been appointed, at a time when the restrictions of § 3-8 applied to JOGO's proposed workout agreement.  HUD has therefore correctly observed its own rules in denying JOGO's appeal, and JOGO cannot show a "substantial indication of probable success" on its due process claim.

## 3. Stay Pending Appeal

Finally, JOGO has orally requested that the Court issue a temporary stay enjoining the November 27 foreclosure sale so that JOGO may appeal this decision.  In this Circuit, the factors to be considered in determining whether to grant a stay are:

> (1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in

13

granting the stay.

Wisconsin Gas, 758 F.2d at 673-74 (citing Virginia Petroleum Jobbers, 259 F.2d at 925).  It is clear, therefore, that "'[i]n ruling on a request for an injunction pending appeal, the court must engage in the same inquiry as when it reviews the grant or denial of a preliminary injunction.'"  Populist Party v. Herschler, 746 F.2d 656, 659 (10th Cir. 1984) (quoting Walter v. Lockhart, 678 F.2d 68, 70 (8th Cir. 1982)).  Because JOGO has not shown that it is entitled to a preliminary injunction, JOGO cannot possibly show that it is entitled to a stay pending appeal.  Accordingly, it is this 25th day of November, 1992,

ORDERED that plaintiff's motion for a preliminary injunction be, and hereby is, denied; and it is further

ORDERED that plaintiff's motion for a stay pending appeal be, and hereby is, denied.

NORMA HOLLOWAY JOHNSON
UNITED STATES DISTRICT JUDGE

14