**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

_____
)
**PAUL CHMIEL**                                    )
                                                   )
  **Plaintiff,**                         )
                                                   )  **Case No. 1:08-cv-00365-HHK**
   **v.**                            )
                                                   )  **Oral Hearing Requested**
**SEDO.COM, LLC, ET AL.**                          )
                                                   )
  **Defendants**                          )
_____)

### PLAINTIFF CHMIEL'S REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY

Plaintiff Paul Chmiel, through counsel, Eric Menhart and CyberLaw P.C., files this Reply and states as follows:

### I. RELEVANT BACKGROUND

The parties are in relative agreement about most, if not all, of the important facts in this matter. The Defendants do not dispute that mTLD, Sedo, or both, were wholly in control of the entire auction process at all times and maintained all powers necessary to administer and control the auction. No party disputes that the various web pages for each of the respective names displayed "auction closed" to the bidders and public at large. No party disputes that the Plaintiff was sent invoices declaring him the winner. The Defendants do not dispute that they made numerous efforts to publicize the "restart" of the auction, including to those who had not previously participated in the auction. Defendants do not dispute that they transferred to a third party a domain name that they knew was subject to judicial oversight.

Sedo was hired by mTLD to handle the auction. As an agent of mTLD, Sedo controlled *all* aspects of the auction administration. If mTLD or Sedo did not want the auctions to send

automatic invoices, they had every power in the world to effectuate that result. If mTLD or Sedo wanted to preclude the Sedo web pages from declaring "auction closed," they had the power to do so. If mTLD or Sedo wanted to ensure that the Plaintiff expressly agreed to the mTLD auction agreements prior to bidding in the auction, they had the power. Defendants had many, many opportunities to preclude litigation like this at every stage of the planning and administration process and failed time and time again to take simple, reasonable precautions.

Both of the Defendants opposing Plaintiff's Motion are sophisticated, well-funded operations. As of February 2007, Sedo handled over $3 million in domain transactions per month, had half a million members, had nine million domains in its database, and sold over 1,500 domains per month. Plaintiff Exhibit #28. mTLD boasts well known investors such as Ericsson, Google, Microsoft, Nokia, Samsung Electronics, T-Mobile, Visa and Vodafone. Plaintiff Exhibit #29. Despite these prominent backgrounds, Defendants now seek to assign the burden of their numerous oversights to the Plaintiff by precluding Plaintiff from obtaining domain names rightfully owed to him.

## II. PLAINTIFF WILL PREVAIL ON THE MERITS

### A. District of Columbia Law Applies

Defendants argue that District of Columbia law relied upon by Plaintiff is not applicable. See Opposition p. 15 n.10. District of Columbia code provides that a sale by auction is complete "when the auctioneer so announces by the fall of the hammer or in other customary manner." D.C. Code § 28:2-328. While Defendants accurately point out that this provision applies to sales of "goods," it is clear that a domain name qualifies as a "good" under District of Columbia law. Under District of Columbia law "'goods' means all things . . . which are movable at the time of identification to the contract for sale." D.C. Code § 28:2-105.

Domain names are distributed as products, like hard goods, or as parts of products that combine software and hardware.[1] Courts have accordingly treated domain names, software packages, and similar "computer resources" as goods under the UCC. See e.g. RRX Indus. v. Lab-Con, Inc., 772 F.2d 543, 546 (9th Cir. 1985) (holding that sale of software and incidental services was governed by the UCC); W. R. Weaver Co. v. Burroughs Corp., 580 S.W.2d 76, 80 (Tex. App. 1979) (holding that software sales are governed by the UCC). Defendants themselves recognize the domain names at issue here as "fungible" domain-name registrations.[2] See Opposition at 24.

As discussed in Plaintiff's Motion, the application of the facts in this matter to the applicable District of Columbia law makes the result clear: Plaintiff had a binding contract with mTLD when the "auction closed" notification was displayed by Sedo on its website.

A matter with very similar facts led to a judgment in Plaintiff's favor by applying similar law. Lim v. The TV Corp. Internat., 99 Cal. App. 4th 684, 689 (Cal. Ct. App. 2002). In Lim, Defendant TV Corp had offered for sale at auction the domain name "golf.tv." Just as in this action, Plaintiff Lim received an invoice declaring, "Congratulations! You have won the auction for the following domain name . . ." Id. at 688. As in this action, the Defendants in Lim attempted to renege and disavow the contract by blaming "an email error that occurred." Id. Defendant TV Corp then attempted to reauction the same name at a substantially higher price, exactly as the Defendants in this action have proposed to do. Predictably, the California appellate court rejected the Defendants' tactics, ruling that the Plaintiff's complaint, which alleged "that the bid for the domain name 'golf.tv' was an offer and was accepted by defendant's e-mail," was

---

[1] Defendants have demonstrated how "movable" domain names may be when mTLD transferred the domain name "video.mobi" to Defendant Colombani while this action was pending.

[2] A standard dictionary actually uses the word "goods" to describe the meaning of the word "fungible," defining the word: "(esp. of goods) being of such nature or kind as to be freely exchangeable or replaceable, in whole or in part, for another of like nature or kind." See Random House Unabridged Dictionary, Random House, Inc. (2006).

legally sound and enforceable. The appellate court went on to remand the action to the trial court, with instructions to find in the Plaintiff's favor.

The present action should resolve similarly. District of Columbia statutes proclaim that the auctions were closed by a "customary manner," which would reasonably be considered the public display of "auction closed" on the Sedo webpages or the sending of the respective invoices to the Plaintiff. As the <u>Lim</u> court properly concluded, these actions lead to valid contracts, under which the Plaintiff is entitled to the names for which he was declared the winner.

### B. Sedo Terms of Service Are Inapplicable, Plaintiff Still Prevails When Applicable

Defendants argue that the Sedo Terms of Service ("Sedo TOS") and the dotMobi End User Agreement ("dotMobi EUA") both apply to this action. As Plaintiff can show, neither of the two documents is applicable to the present action. Even assuming, *arguendo*, that such contracts are applicable, the Plaintiff would still prevail at trial.

### 1.    Sedo TOS are Unconscionable

Plaintiff does not dispute that he agreed to the Sedo TOS. <u>See</u> Affidavit of Paul Chmiel, Plaintiff Exhibit #30 at ¶ 4. The Sedo TOS is not applicable to this action, however, because that proposed agreement was unconscionable as to the Plaintiff and all other bidders.

Liability for common law unconscionability in the District of Columbia "requires two findings: 'an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.'" <u>Williams v. First Gov't Mortg. & Investors Corp.</u>, 343 U.S. App. D.C. 222 (D.C. Cir. 2000) (<u>citing</u> <u>Williams v. Walker-Thomas Furniture Co.</u>, 121 U.S. App. D.C. 315, 350 F.2d 445 (D.C. Cir. 1965).

The Sedo contract contained many terms that were unreasonably favorable to Sedo. Section 3 of the Sedo TOS, entitled "Acceptable Use," provides: "Sedo may, in its sole discretion, with or without notice, terminate your access to the Site and Services." Docket 13-3 at 3. Sedo attempts to retain the right to terminate anyone, for any reason, and still provide no notice of termination. This is unreasonably favorable to Sedo and unfavorable to users such as Plaintiff Chmiel.

Section 6 of the Sedo TOS, entitled "Liability Disclaimer and Indemnification," provides that Sedo's liability is limited in all circumstances to "the amount of fees paid in the last twelve (12) months prior to the action giving rise to the liability, and (B) $100." Docket 13-3 at 18. The suggestion that Sedo's liability in every circumstance could somehow be limited to such minute sums is unreasonably favorable to Sedo.

The Sedo TOS are additionally unconscionable because there was no alternative outlet for Plaintiff to obtain the specific domain names at issue in this case. The unique domain names were only available at the Sedo website, at a specific time, in the specific auction. Plaintiff had no other reasonable choice but to enter the contract that was unreasonably favorable to Defendant Sedo in order to obtain the highly unique domain names that were not available anywhere else. Plaintiff Exhibit #30 at ¶ 4. Defendants can point to "no reasonably available market alternatives [to defeat] a claim of adhesiveness." Cf. Dean Witter Reynolds, Inc. v. Superior Court, 211 Cal. App. 3d 758, 259 Cal. Rptr. 789, 795 (Ct. App. 1989). It is undisputed that the names at issue in this matter were only available at this particular auction at the Sedo website.

Agreements similar to the Sedo TOS, in factual circumstances similar to the case at bar, have been found to be contracts of adhesion. In one matter involving the "Second Life" virtual

world, the Court found that an agreement presented "on a take-it-or-leave-it basis" was a contract of adhesion. <u>Bragg v. Linden Research, Inc.</u>, 487 F. Supp. 2d 593, 606 (D. Pa. 2007). Like here, a potential participant in that case could "either click 'assent' to the TOS, and then gain entrance to Second Life's virtual world, or refuse assent and be denied access." <u>Id.</u> As in this matter, the Plaintiff "was never presented with an opportunity . . . to negotiate terms different from the TOS" that the Defendant offered. <u>Id.</u> The <u>Bragg</u> court went on to find that Second Life was the only "meaningful choice" available to Plaintiff by holding that "although it is not the only virtual world on the Internet, Second Life was the first and only virtual world to specifically grant its participants property rights in virtual land." <u>Id.</u>

The facts in the present matter are surprisingly similar to <u>Bragg</u>. Plaintiff had no choice but to "assent" to the Sedo TOS in order to be granted access to the Sedo site. While Sedo is not the only domain name marketplace on the Internet, it was the only "meaningful choice" available to the Plaintiff that wanted to take advantage of the opportunity to bid on this particular group of highly unique and "premium" domain names. Because Plaintiff had no choice but to agree to the contract that heavily favored the Defendants, the Sedo TOS was not applicable, and District of Columbia law governing auctions, as discussed above, should apply.

### 2. Even where Sedo TOS Apply, Plaintiff Will Still Prevail at Trial

Defendants argue that Plaintiff was not the highest bidder at any point in the auction.[3] Even if all of the facts proposed by the Defendants are true, they are directly contradicted by the very public information already submitted by the Plaintiffs, which the Defendants do not dispute.

---

[3] The Defendants attempt to prove this point by showing numerous facts about bidding history, server errors, and various other facts that are exclusively under the Defendants' control, are unverified, not provided as exhibits, and are easily "fudged" computer and other records. Plaintiff is in no position to disprove what appears in the records and affidavits of the Defendants because Plaintiff has no discovery powers at this point in the litigation.

Public web pages proclaimed the Plaintiff the winner of the respective domain names, and invoices sent by the Defendants verified these public notices. See Plaintiff Exhibits #4, 7-11.

Section 5.1.2.4 of the Sedo TOS clearly states that in factual disputes such as these, ***"the highest offer made on a particular Domain will be indicated on the Bidding Page via Sedo's website."*** Docket 13-3 at 8 (emphasis added). Defendants' attempt to show that a secret server log in Germany is somehow binding on the Plaintiff is *irrelevant according to their own terms of service*. When the bidding pages displayed "auction closed," the auction was over and the Plaintiff was the winner. Any suggestion to the contrary is simply not sustainable because it would be inconsistent with the Sedo TOS.

Further application of the Sedo TOS shows that Plaintiff is entitled to the names he won at auction. Under 5.1.2.2 of the Sedo TOS, entitled "Binding Declaration of the Seller" it is expressly stated that "seller further agrees that he will accept the highest valid offer made during the Auction Period . . ." Docket #13-3 at 7. Under 5.1.2.3, entitled "End of Auction," the Sedo TOS provides that the "Auction Period will run for a seven day period . . . Upon approaching the close of the seventh day, the Auction Period will extend for ten minutes each time a valid offer is placed within the last five minutes of the Auction Period." Docket #13-3 at 8. Next, under 5.1.2.4, "Auction Period and Transfer," the Sedo TOS state:

> During the Auction Period, the highest offer made on a particular Domain *will be indicated on the Bidding Page via Sedo's website.* Sedo customers can then enter the Auction by placing higher offers. All offers will be construed as firm offers to buy the Domain for the offered price in accordance with the conditions of the purchase and sale agreement for the Domain. If no offer is made during the Auction Period and the Auction was not cancelled by Sedo or otherwise, a legally binding contract exists between the Seller and the potential Buyer who placed the last bid before the Auction ends. If valid higher offers are placed during the Auction Period, and the Auction was not cancelled by Sedo or otherwise, a legally binding contract exists between the Seller and the prospective Buyer who placed the highest bid *as reflected at the end of the Auction Period. This contract exists even if the Sedo bidding page is not available at the end of the Auction Period*

Docket #13-3 at 8. Next, Section 5.1.2.7[4] of the Sedo TOS, entitled "Liability," provides

as follows:

> Sedo in no way guarantees or further warrants that the web page on which bids can be placed ("Bidding Page") during the Auction Period is permanently accessible. *If a Bidding Page is not accessible, the Seller may not, in the future refer to a potentially higher bid during this time period as a mechanism for not following through with a sale.* Furthermore, *a potential bidder may not argue, for the same purposes, that he would have been the highest bidder for the Domain up for Auction if the webpage would have been available.*

Docket #13-3 at 9 (emphasis added). Finally, 5.1.3.4 of the Sedo TOS, entitled "Legal

Relationship as Between Sedo, Buyer and Seller" provides:

> Sedo is neither the owner of the Domains listed in the Domain Marketplace and/or Auction nor does it have any influence or control on the business conducted among Users of the Domain Marketplace and/or Auction . . . Sedo shall not be liable for legal transactions or other acts of Domain Marketplace and/or Auction users.  Buyer and Seller agree that Sedo shall not be held responsible for the failure of either party to a purchase and sale agreement to follow-through with their obligations under such an agreement and that Sedo, as the neutral facilitator of the Domain Marketplace, Auction, and associated Services, shall not be subject to any claims arising from the attempted purchase and sale of Domains.

Docket #13-3 at 11. Application of these various provisions leads to a conclusion that the

Plaintiff holds a valid contract with seller mTLD. First, under Sedo TOS 5.1.2.2, mTLD was

bound by the Sedo TOS due to its role as a seller of ".mobi" domain names on the Sedo web site.

Docket #13-3 at 7.

As a seller, mTLD was bound by a "legally binding contract" with Plaintiff, who had

placed "a valid offer above the reserve price during the Auction Period . . . as reflected at the end

of the Auction Period," according to 5.1.2.4 of the Sedo TOS. Docket #13-3 at 8. Plaintiff's was

the highest offer, because as previously discussed, "the highest offer made on a particular

Domain will be indicated on the Bidding Page via Sedo's website," under 5.1.2.4 of the Sedo

---

[4] This is the only provision that may be considered a "force majeure" provision in the Sedo TOS.

TOS. Id. This contract exists even if the Sedo bidding page is not available at the end of the Auction Period. Id.

This conclusion is further buttressed by the existence of 5.1.2.7 of the Sedo TOS, entitled "Liability." This section precludes mTLD from attempting to avoid a contract due to a technical error, which is exactly what mTLD attempts to do in this matter. Sedo TOS 5.1.2.7 states that in times where a Bidding Page is not accessible, such as here, "the Seller may not, in the future refer to a potentially higher bid during this time period as a mechanism for not following through with a sale." Docket #13-3 at 9. Just as Plaintiff Chmiel is bound under the Sedo TOS to honor the bids that he made at auction, mTLD, as the seller at Sedo's website, is equally bound to honor its duties to sell to the highest bidder in circumstances when the bidding page is not accessible.

Even assuming, *arguendo*, that there were "valid" bids placed within the last five minutes, which is impossible because such bids were not reflected on the Sedo website, there were no justifiable grounds to "restart" the auction after it was terminated. Section 5.1.2.3 of the Sedo TOS expressly states that "upon approaching the close of the seventh day, the Auction Period will extend for *ten minutes* each time a valid offer is placed within the last five minutes of the Auction Period." Docket #13-3 at 8 (emphasis added). As shown, Defendants restarted the auction for a period of three hours, a completely arbitrary period of time, after engaging in a massive publicity campaign which included direct contact with thousands of people who were never involved in the initial auction. These actions demonstrate the Defendants' disregard for their own TOS, and demonstrate their obvious intent to further line their profits instead of performing under their contractual obligations to Plaintiff.

C. **dotMobi End User Agreement is Inapplicable, Plaintiff Still Prevails When Applicable**

1. **dotMobi EUA is Not Applicable Because mTLD Did Not Obtain Plaintiff's Consent**

The dotMobi EUA is simply not applicable to this dispute. Plaintiff never read the dotMobi EUA prior to the auction, and never agreed to the terms of the dotMobi EUA. Plaintiff Exhibit #30 at ¶ 5. It cannot be underscored enough that *Defendants themselves concede that the Plaintiff never agreed to the dotMobi EUA*. In their Opposition, Defendants implicitly admit their failures by relying on arguments that suggest that the mere existence of the dotMobi EUA "somewhere in cyberspace" would somehow lead to the Plaintiff's agreement with those terms. These arguments are quite to the contrary of widely accepted case law governing online agreements.

First, Sedo and mTLD failed to take reasonable steps to ensure that the bidders at the Sedo website affirmatively agreed to the dotMobi EUA. Sedo easily obtained Plaintiff's consent to the Sedo TOS when it mandated that the Plaintiff affirmatively agree to the Sedo TOS prior to signing up as a registered user on its website. Plaintiff Exhibit #30 at ¶ 4. mTLD, working with its agent Sedo, could have easily implemented a similar sign up process prior to any potential bidder being granted an opportunity to bid on the names at auction. Indeed, the Defendants' failure to implement this simple step meant that *none* of the "premium .mobi auction" bidders, including Plaintiff, agreed to the dotMobi EUA prior to placing bids in the auction.

It is very well established that a party seeking a user's consent to an Internet agreement shall obtain that user's affirmative consent to the agreement using the "clickwrap" method of obtaining consent via the Internet or similar "on screen" presentations of an agreement. The best

explanation of "clickwrap" contract agreements was provided by the Southern District for New

York in 2001:

> A click-wrap license presents the user with a message on his or her computer screen, requiring that the user manifest his or her assent to the terms of the license agreement by clicking on an icon. The product cannot be obtained or used unless and until the icon is clicked. For example, when a user attempts to obtain Netscape's Communicator or Navigator, a web page appears containing the full text of the Communicator / Navigator license agreement. Plainly visible on the screen is the query, "Do you accept all the terms of the preceding license agreement? If so, click on the Yes button. If you select No, Setup will close." Below this text are three button or icons: one labeled "Back" and used to return to an earlier step of the download preparation; one labeled "No," which if clicked, terminates the download; and one labeled "Yes," which if clicked, allows the download to proceed. Unless the user clicks "Yes," indicating his or her assent to the license agreement, the user cannot obtain the software.

Specht v. Netscape Communs. Corp., 150 F. Supp. 2d 585, 594 (S.D.N.Y. 2001). The

Specht court goes on to note that "the few courts that have had occasion to consider click-wrap

contracts have held them to be valid and enforceable." Id. (citing In re RealNetworks, Inc.

Privacy Litigation, 2000 U.S. Dist. LEXIS 6584, No. 00 C 1366, 2000 WL 631341 (N.D. Ill.

May 8, 2000); Hotmail Corp. v. Van Money Pie, Inc., 1998 U.S. Dist. LEXIS 10729, No. C98-

20064, 1998 WL 388389 (N.D. Cal. April 16, 1998). The Specht "clickwrap" standard of

obtaining a user's consent to an online agreement has been adopted or favorably cited by courts

all over the country. See e.g. Am. Gen. Fin., Inc. v. Bassett (In re Bassett), 285 F.3d 882, 886

(9th Cir. 2002); Moore v. Microsoft Corp., 293 A.D.2d 587 (N.Y. App. Div. 2002); I. Lan Sys. v.

Netscout Serv. Level Corp., 183 F. Supp. 2d 328, 336 (D. Mass. 2002); Register.com, Inc. v.

Verio, Inc., 356 F.3d 393, 428 (2d Cir. 2004)).

Defendants' failure to obtain the Plaintiff's consent to the dotMobi EUA over the course

of three separate auctions and many months of time now leads Defendants to argue "that a seller

may place terms and conditions on an auction by publishing them beforehand." Opposition at 17.

Defendant mTLD admits that "mTLD published its auction announcement and the dotMobi End User Agreement *on its [own] website*." Opposition at 18 (emphasis added). This is not sufficient under any legal theory. Mere "access" to terms or conditions is far from obtaining a user's consent to such terms. The law on this matter is clear: reference to "terms on a submerged screen is not sufficient to place consumers on inquiry or constructive notice of those terms." Specht v. Netscape Communs. Corp., 306 F.3d 17, 32 (2d Cir. 2002). Given that the heavily cited Specht court holds that terms hidden by as little as a submerged screen are not enforceable, it seems a stretch to buy the Defendants' argument that terms referenced in a press release and available "somewhere on the Internet" are somehow enforceable against a Plaintiff that never read or agreed to such terms. Plaintiff Exhibit #30 at ¶ 5.

Furthermore, the fact that a potential bidder had already agreed to the long and dense Sedo TOS makes it even less likely that the bidder would reasonably expect that he might have to hunt for numerous other supplementary or additional auction agreements that were not presented to him in the same manner in which the Sedo TOS were displayed. This is particularly true because the Sedo TOS, to which the Plaintiff had already agreed, expressly warned bidders *not* to rely upon information found on other sites:

> Sedo is in no way responsible for the content of any web site owned or operated by a third party that may be linked to or from the Site via hyperlink, whether such hyperlink is provided by Sedo or by a third party. No judgment or warranty is made with respect to the accuracy, timeliness or suitability of the content of any web site to which the Site may link, including information on the web site regarding the Sedo Site.

Docket 13-3 at 18. Sedo's warnings that users should only rely on Sedo's communications is supported by applicable law. It has been recognized that "unless a contrary intention is manifested, bids at an auction embody terms made known by advertisement, posting, or other publication of which bidders are or should be aware, as modified by any announcement

*made by the auctioneer* when the goods are put up." Lawrence Paper Co. v. Rosen & Co., 939

F.2d 376, 379 (6th Cir. 1991) (citing Restatement (Second) of Contracts § 28(2)) (emphasis

added). As demonstrated, the *only* "advertisement, posting or other publication" ever displayed

to the Plaintiff at the auction site were the Sedo TOS, to which Plaintiff agreed. Plaintiff Exhibit

#30 at ¶ 4. There was no additional modifying announcement made by the auctioneer, Sedo, as to

the additional dotMobi EUA that mTLD now seeks to enforce.

Every case cited by Defendants in support of their "publication" argument involved terms

that were *posted by the auctioneer at the physical auction location.* The auction "location" in this

matter is the Sedo website, where the Sedo TOS were displayed and met the "clickwrap"

requirements necessary to show Plaintiffs' consent to the terms. Defendants' failure to meet that

same standard as to the dotMobi EUA is fatal to their attempt to enforce these terms against the

Plaintiff now.

Defendants assert that "among the terms and conditions that a seller may place on an

auction is one that permits the seller to reject a bid for any reason, even after an auctioneer has

accepted a bid." Opposition at 18. The Defendants' problem, as discussed, is that no such

reservations were made by Defendant mTLD, who never obtained Plaintiff's consent to the terms

that mTLD now seeks to employ. Case law cited by the Defendants themselves supports this

point. In Cuba v. Resolution Trust Corp., the court held that "in auctions where the seller does

not reserve the right to reject a high bid or reserve the right to impose some added condition on a

sale . . . the seller's 'acceptance' of the offer is signaled generally by the fall of the auctioneer's

hammer." Cuba v. Resolution Trust Corp., 849 F. Supp. 793, 796 (D. Ga. 1994). Even if consent

had been obtained, the reservation of rights by mTLD were so unconscionable that they would be

unenforceable, as discussed below. As shown, the Defendants never reserved the right to reject

bids, and the sale of the various domain names was complete when Sedo declared the auction closed on its website or sent the invoices to Plaintiff.

### 2.    The dotMobi EUA is Unconscionable

Assuming *arguendo*, that the Plaintiff had agreed to the dotMobi EUA, that agreement would still fail because it is unconscionable to the Plaintiff. As discussed above, a contract is unconscionable under District of Columbia law when there is an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party. See e.g. Williams v. First Gov't Mortg. & Investors Corp., 343 U.S. App. D.C. 222 (D.C. Cir. 2000). A brief examination of the proposed dotMobi EUA reveals numerous provisions that are so unreasonably favorable to mTLD that they must be unconscionable. For example, Section 2 of the dotMobi EUA entitled "Modification of Auction Agreement," provides:

> mTLD, in its sole discretion, may amend this Auction Agreement at any time by posting the amended terms on the dotMobi Site. You expressly agree to be bound by the Auction Agreement in effect at the time of your participation in the Auction. It is your responsibility to review the dotMobi Site, including the Auction Agreement posted on that Site, for any modifications or amendments.

Docket #14-3 at 4. mTLD fails to even provide the courtesy of a notice when terms change, and the rest of this provision is simply not "legal," as discussed above, because its attempts to mandate agreement are inconsistent with applicable law. See e.g. Specht v. Netscape Communs. Corp., 150 F. Supp. 2d 585, 594 (S.D.N.Y. 2001). No bidder can be bound by the mere "availability" of terms. Next, Section 3 of the dotMobi EUA entitled "Modification of Auction Agreement," provides:

> mTLD may terminate this Auction Agreement and/or revoke any Authorization Code for which you are the winning bidder if it determines in its sole discretion that You have acted inconsistently with the obligations or the spirit of this Auction Agreement . . .

Docket #14-3 at 4. Attempts to reserve the right to terminate a bidder's rights to a name for violation of the "spirit" of the Auction Agreement is overly broad and provides no reasonable guidance to a user attempting to discern what a "spirit" violation may entail. A contract that can only be constructed in the drafter's favor cannot be considered conscionable.

Similarly, under Section 5, entitled "Bids and Conduct of Auction," mTLD attempts to ensure its right to reject a bid from any Participant "for any reason." Docket #14-3 at 5. A winning bidder, of course, has no such option. Instead, "the winning bidder shall be obligated to complete the transaction and to pay the amount of the winning bid as provided herein." Id. Allowing mTLD to reject a bid for any reason but always obligating a winning bidder to complete a transaction is the definition of an unconscionable contract.

Numerous other provisions are unconscionable, including Section 10, entitled "Disclaimer of Warranties," which attempts to disclaim all warranties for "authorization code[s] for which you are the winner." Docket #14-3 at 8. This is analogous to General Motors disclaiming all warranties as to a vehicle it sells. mTLD's only role is providing authorization codes for transfers of domain names. Attempting to disclaim liability for the very product or service offered by an entity is unreasonably favorable to the drafting party.

Section 13, entitled "Liability Disclaimer" attempts to provide that "in no event shall mTLD be liable" for virtually anything, including auction failures. Docket #14-3 at 9-10. According to these terms, mTLD and its agents could do virtually anything they wanted, and still avoid *any* liability. Such reservations are overly broad and unconscionable to those that would be harmed by very negligent behavior, such as seen in this action, on the part of mTLD or its agents.

Assuming, *arguendo*, that Plaintiff had agreed to the dotMobi EUA, the terms of the dotMobi EUA would have to be considered unconscionable. District of Columbia law, as discussed above, would apply.

### 3.    Even Where the dotMobi EUA Applies, Plaintiff is Still Entitled to His Names

The dotMobi Auction Agreement includes in emboldened language that this "Auction Agreement is **in addition to, and not in place of** any other agreements or understandings of any kind relating the Auction and use of an Authorization Code between You and the Event Organizer, the Auction Manager, the Escrow Agent, any Registrar, or any other third party." Docket #14-3 at 2 (emphasis in original).

Section 5 of the dotMobi EUA, entitled "Bids and Conduct of Auction," states that "In the event of any dispute between bidders with respect to the conduct of the Auction, the Auction Manager shall have sole and final discretion to determine the winning bidder." Docket #14-3 at 5. As discussed above, Sedo is the "Auction Manager" and Plaintiff prevails even where the Sedo TOS are applied. Thus, even where the Plaintiff agreed to the dotMobi EUA and the dotMobi EUA is not unconscionable, the Plaintiff *still* prevails at trial.

### D. Mistake is Not an Applicable Defense

As Defendants note in their Opposition, a mistaken party may only avoid the contract when "the other party knew or had reason to know of the mistake." Opposition at 20.

First, there were no "mistakes" at all as to the scheduled conclusion of the auction and declaration of winning bidders. The auction ended at the time the Defendants had advertised, and the Sedo website displayed that the auction was over at the same time. Winning invoices were sent to the highest bidders as displayed on the Sedo web site at the time of the auction's close, which was consistent with procedures as outlined in the Sedo TOS. The circumstances of the

auction proceeded exactly according to plan. Defendants cannot argue that the Plaintiff should have been aware of a "mistake" when the entire auction was being completed in accordance with publicized terms.

Second, Defendants spend several pages of their opposition suggesting that the prices of the names at issue in this matter were "well below market value," and that this fact would preclude Plaintiff from reasonably expecting that he was the winning bidder. Opposition at 20-22. This argument fails for numerous reasons.

It is indisputable that when a good such as a domain name is at auction, the "fair market value" is the price paid by the highest bidder. In addition, each of the domain names at issue in this matter had *already met their reserve price, and these reserve prices were determined and set by the Defendants themselves*. A name that had not reached its reserve price would have led to the Sedo web site displaying "reserve not met" or similar. The fact that the reserve prices were met meant that the "fair market prices" set by the Defendants themselves had already been met.

Furthermore, the prices reflected in the invoices sent by the Defendants to the Plaintiff were consistent with other prices for other names in the auction that only featured "premium names." At the end of the auction, the prices for Plaintiff's names were consistent with the prices paid by other bidders for other similar names. The prices in the invoices were also all within a reasonably expected price range.

The Defendants' suggestion that Plaintiff should have known that the prices were below fair market value is based on prices that were known to Defendants *after the time at which the Plaintiff received the invoices*. Defendants had undisputedly gone on a massive promotional campaign in an attempt to drive up prices in the "extended auction." What was "fair market value" in the first auction could not be reasonably compared to prices obtained in the second

17

auction after Sedo and mTLD had gone on a promotional blitz to attract more bidders and drive up the prices in an attempt to further line their pockets.

Defendants next argue that the Plaintiff was somehow obligated to monitor numerous names in the last ten minutes of the auction, analyze whether the particular auctions were continuing to receive bids, compare them to previous auctions, and then evaluate, in real time, whether there was a mistake by two organizations with vast available resources. This suggestion simply cannot be taken seriously. Plaintiff is not obligated to undertake such technical analysis of multiples of auctions that are happening in real time. Even if he did, he wouldn't have concluded that there was any relevant mistake that would affect his right to purchase the names he won at auction.

Defendants next argue that "Plaintiff continued to actively bid when the auction resumed in the afternoon." Opposition at 22. Defendants suggest that these actions somehow show that the Plaintiff knew that he had no valid contract. To the contrary, Plaintiffs' continued bidding was perfectly reasonable under the circumstances. Given the total pandemonium created by mTLD and Sedo's decision to "restart" the auction, Plaintiff did what any reasonable person would do: mitigate his damages. Plaintiff knew that he wanted the highly unique domain names at auction. Defendants' actions threatened to preclude his previous bids. Thus, Plaintiff took the reasonable step of "covering" by bidding on the names at issue and other names that might be considered reasonable value. Plaintiff Exhibit #30 ¶ 9. The suggestion that Plaintiff, a non-lawyer, could have affirmatively determined that a binding contract was in place in the three hours he had to consider the issue, particularly when that exact issue is now disputed in at least two courts by at least eight attorneys, is simply not reasonable.[5] Given all of the circumstances,

---

[5] There is little doubt that if Plaintiff had simply not participated in bidding after the auction was extended, Defendants would have argued that he somehow failed to mitigate his damages.

the limited time in which to make a decision and the general panic created by the Defendants' actions, it is difficult to conclude that Plaintiff did anything other than what a reasonable person might do under similar circumstances.

### III. IRREPARABLE HARM IS PRESENT

Defendants argue that there is no irreparable harm in this matter, yet admit that irreparable harm is present when "a party may make the necessary showing [that] he can establish that he would be entitled to specific performance." Opposition at 23 (citing Clay v. Faison, 583 A.2d 1388 (D.C. 1990)).

Plaintiff has shown throughout this matter that he seeks specific performance of the enforcement of the contracts formed between him and the Defendants. See e.g. Amended Complaint at 14. Furthermore, the Plaintiff has shown that the domain names at issue are highly unique, in the same manner that land might be considered unique:

> Domain names are very similar to land in that they are highly unique entities in commerce. No domain name is exactly like another, and nothing else in the world, particularly money, is sufficient to redress the loss of such unique "cyberproperty." Redress with other "replacement" domain names would not be sufficient to put Plaintiff in the place he might otherwise be with the names he originally planned to, and did, purchase.

See Docket #6 at 4. The Defendants' arguments in opposition to Plaintiff's showings are so attenuated that they are relegated to citing unpublished case law nearly sixteen years old when they rely upon JOGO Assocs. v. United States Dep't of Hous. & Urban Dev. Opposition at 25. Compare this to the authority in Plaintiff's Motion, which provides a case from 2005 that could not have agreed with JOGO, which argues that property is not necessarily unique, because Plaintiff's authority comes to the opposite conclusion. Independence Mgmt. Co. v. Anderson & Summers, LLC, 874 A.2d 862, 870 (D.C. 2005).

Defendants further argue that "even where real property is at issue, the general rule applies that irreparable harm is shown only where money damages would be inadequate." Opposition at 25. This is simply not accurate. District of Columbia courts have held that when "land is the subject matter of the agreement, the legal remedy is assumed to be inadequate, since each parcel of land is unique; thus, equitable jurisdiction . . . is firmly established." Flack v. Laster, 417 A.2d 393, 400 (D.C. 1980) (citing City Stores Co. v. Ammerman, 266 F. Supp. 766, 776 (D.D.C. 1967), aff'd 129 U.S. App. D.C. 322, 394 F.2d 950 (1968)). While Plaintiff appreciates that land and domain names do have differences, "cyberproperty" such as domain names are so legally similar to parcels of physical land that they should be treated similarly under the legal analysis.

## IV. BALANCE OF INJURIES IS IN PLAINTIFF'S FAVOR

Defendants make numerous arguments suggesting that they would be harmed by an injunction. Opposition at 26. Each of these arguments fails.

First, it is telling that Defendants do not dispute any of the factual assertions that the Plaintiff makes in his Motion. See Docket #6 at 6-8. Specifically, the Defendants do not dispute that they have approximately 5,000 "premium names" in inventory that have yet to be offered to the public in any way. Motion at 6-7. If mTLD were harmed in any way by retaining such "premium names," they would have at least *attempted to move more than 9% of the names over a year's time*. Id. The Defendants' silence as to this point is extremely deafening.

Defendants argue that Plaintiff is not harmed because no contract exists. This issue has been pleaded *ad nauseam* in this matter and need not expend more of the court's time. Next, Defendants suggest that they would "suffer from a court decision that created doubts about their ability to transfer valid authorization codes at an auction." Opposition at 27. There is little

question that the Defendants themselves have already created plenty of doubt about their ability to competently hold a domain name auction. A court order stating this obvious fact would hardly be the proverbial straw on the camel's back.

Next, unable to show *any* harm to themselves, Defendants attempt to suggest that there is harm to third party bidders if an injunction would issue. Third party bidders had every right to participate in the auctions in which the Plaintiff won the names. No further harm exists to those that did not place the highest bid for the names at issue when they were at auction.

### A. Defendants Have Already Created Harm

Defendants assert that the lack of a Preliminary Injunction Motion during initial settlement discussions gave them the "green light" to transfer a name in dispute to a third party.[6]

First, it must be stated unequivocally that Defendants Sedo and mTLD, with consent of their respective legal counsel, affirmatively chose to transfer "video.mobi" to a third party while this suit was pending. Regardless of any pending motion, Plaintiff's position is that the Defendants' transfer of a name that was in dispute, while not "legally forbidden," was in extraordinarily poor taste, showed substantial disrespect for the Plaintiff, the court, and the judicial process as a whole and was an action that could not reasonably be sanctioned by any officer of the court. The decision to transfer this name was even more detestable given that the Defendants *still had over 5,000 other "premium names" available and had no pressing need to move the domain "video.mobi," to a third party while determination of it's proper owner was pending in a court of law.*

---

[6] Counsel for the parties have discussed this issue at length and both sides have different understandings of promises that may or may not have been made at that time. Because argument about this issue is analogous to "crying over spilled milk," the current Motion looks at the facts as they are presently situated. Plaintiff's counsel is ready, willing and able to show that the Defendants were well aware of a pending Preliminary Injunction Motion at least as early as January 25, 2008, and yet still transferred the name "video.mobi" that was undisputedly at issue in this action.

The suggestion that "a preliminary injunction also would cloud the rights of Mr. Columbani" completely ignores the fact that Defendants had every opportunity to keep Mr. Colombani out of the action by simply retaining the name "video.mobi" while this action was pending. Virtually guaranteeing that Mr. Colombani would be named in a lawsuit by transferring the name to him, then attempting to use his plight as an argument against an injunction is approaching the apex of hypocrisy.

## V. DEFENDANTS SHOW NO APPETITE FOR SERVING THE PUBLIC INTEREST

Again, it is telling that the Defendants do not dispute any of the Plaintiffs' assertions as to facts concerning the public interest. Defendants do not dispute that Plaintiff Chmiel helped co-found the website "Mobility.mobi," which allows for discussion and promotion of mobile web browsing. Defendants do not dispute that Plaintiff Chmiel has developed numerous ".mobi" web sites in an attempt to improve the mobile web.

Defendants also apparently agree with the Plaintiff's assertions that the Defendants are driven purely by profit and have shown little interest in the public good. Defendants admit that their preference is to transfer names to "others [who] were willing to pay far more for the codes." Opposition at 28. Finally, Defendants offer no affirmative evidence that their interest is anything other than maximum private profit. Taken together, these facts ensure that an injunction in Plaintiff's favor is most aligned with the public interest.

## VI. LIMITED EXPEDITED DISCOVERY IS APPROPRIATE

Though expedited discovery is requested only as a last resort, Plaintiff does not believe that the Defendants have shown any ground for denying such relief where the court may determine that discovery is appropriate for the proper determination of this Motion. Defendants themselves recognize that when a Plaintiff makes a strong preliminary showing on the merits,

much of it unchallenged by the Defendants, as is the case here, limited discovery is appropriate. Opposition at 30.

Plaintiff has made a strong preliminary showing on the merits, supported by both factual exhibits and legal authority. Just as in Optic-Electronic Corp., Defendants Sedo and mTLD have challenged virtually none of the facts that the Plaintiff has shown, and Plaintiff's legal authority provides the requisite showing for additional discovery as the court may see fit. Optic-Electronic Corp. v. United States, 683 F. Supp. 269, 270 (D.D.C. 1987).

Defendants raise concerns about the burden of expedited discovery and complain about the proposed schedule that may be implemented. While Plaintiff believes that the proposed schedule is reasonable, he is willing to work with the opposing parties and the court to come to a reasonable compromise that would allow the Plaintiff to obtain the necessary information in an expedited fashion that would not be overly burdensome to any party.

## CONCLUSION

Given the foregoing, the Plaintiff believes that his Motion for Temporary Restraining Order, Preliminary Injunction and Expedited Discovery is appropriately granted and Plaintiff respectfully asks this Court to grant that relief.

## Oral Hearing Requested

Plaintiff respectfully requests an oral hearing.

Respectfully submitted,



_____
Eric J. Menhart (D.C. Bar No. 975896)
CyberLaw P.C.
1200 G St NW Suite 800
Washington, DC 20005
eric.menhart@cyberlaw.pro
Phone: 202-434-8711
Fax: 240-539-6235
http://www.cyberlaw.pro


## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 27th day of March, 2008, a copy of the foregoing was electronically filed with the Clerk of the Court. All counsel of record registered with the Court's electronic filing system were automatically served by the system.


_____
Eric J. Menhart (D.C. Bar No. 975896)
CyberLaw P.C.
1200 G St NW Suite 800
Washington, DC 20005
eric.menhart@cyberlaw.pro
Phone: 202-434-8711
Fax: 240-539-6235
http://www.cyberlaw.pro



UK    Deuts

**Home**    **Park Domains**    **Buy Domains**    **Sell Domains**    **Services**

**My Sedo**

Username
[                    ]

Password
[                    ]

**About us**

About us

> **Login**

Overview

Contact us

Press Page

Careers

Pricelist

Advertising

Policies

Register

Lost Password?

Security Advice



. Sedo **About Us**

**Welcome to Sedo**

Sedo is the global marketplace for buying and selling domain names and websites with offices in the US and Germany.

## About us

With more than 500,000 members around the world trading domains in more tha
Sedo stands alone as the world's only global domain marketplace. It may be clos
directly register good domains anymore but the Sedo domain marketplace offers
largest selection of premium domains with more than 9 million available for sale!

Sedo offers our users all the tools needed to buy and sell domains among a comr
stretching around the world, including domain appraisals, brokerage services, pro
but not least, Sedo's popular domain parking program. More than 3 million doma
parking programs to earn revenue while promoting its sale.

## Our Success Story

Recently celebrating our fifth anniversary, Sedo has experienced remarkable succ
global domain name marketplace and expanding into a wide selection of domain

Currently employing close to 160 employees from more than 25 countries at offic
Cambridge, Massachusetts and Cologne, Germany, Sedo relies upon the diversity
to continue extending the reach of our services to anyone who has an internet co
regardless of language or location.

A constant drive to innovate and expand our services has put research and devel
top of Sedo's priorities. With a wide range of domain name services and unparalle
service, Sedo is positioned to continue its growth as a complete domain service p
internationally recognized brand.



**Numbers and facts** (As of: 1st Feb 2007)**:**

Domain transaction volume per month: > $3 million

Number of members: 500,000

Number of domains in our database: 9,000,000

Number of parked domains: 3,000,000

Number of domains sold per month: > 1,500



## Contact Information

Sedo.com, LLC
161 First Street, Fourth Floor

## Investor Relations

Sedo is a subsidiary company of the
AdLINK Internet Media AG (

Plaintiff Exhibit #28



## about us

dotMobi (the informal name of mTLD Top Level Domain, Ltd.) was appointed by ICANN as the official global registry for the .mobi top level domain.

dotMobi is backed by leading mobile operators, network device manufacturers and Internet content providers. Our investors include Ericsson, Google, GSM Association, Hutchison, Microsoft, Nokia, Orascom Telecom, Samsung Electronics, Syniverse, T-Mobile, Telefónica Móviles, TIM, Visa and Vodafone.

dotMobi is also a sponsor of W3C's Mobile Web Initiative and is the Founding Mobile Sponsor of the Webby Awards.

© 2008 mTLD, Ltd. All rights reserved. Legal

Plaintiff Exhibit #29

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
PAUL CHMIEL                          )
                                     )
              Plaintiff,             )        Civil Action No. 1:08-cv-00365 (HHK)
                                     )
       v.                            )
                                     )
SEDO.com, LLC, *et al.*              )
                                     )
              Defendants.            )
_____)

**DECLARATION OF PAUL CHMIEL IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND
EXPEDITED DISCOVERY**

I, Paul Chmiel, hereby declare as follows:

1.      I am over 18 years old and competent to testify as to the issues contained in this affidavit. I am the remaining plaintiff in this lawsuit and reside in Houston, Texas.

2.      I participated in the prior dotMobi Premium Auctions held at Sedo, commencing on September 26, 2007, and October 31, 2007. GPS.mobi was the only domain that I successfully won through my participation in these auctions.

3.      I participated in the third .Mobi Premium Auction, the subject of this suit, which was scheduled to take place as a seven day auction from November 28, 2007, to December 5, 2007.

Plaintiff Exhibit #30

4.    The only way that I could acquire the domain names at issue in this suit was to participate in the .Mobi auction. I was required to check a box as to Sedo's Terms of Service to enter this auction.

5.    I neither came across, nor checked, any box for a separate agreement directly for the mTld. I did not agree to be bound by any agreements or conditions by the mTld at any point in time prior or during the subject Auction. I have since read the dotMobi Auction Agreement and believe that the mTld should not have the ability to void winning bids for any bidder in the auction for any reason whatsoever, especially since the mTld is the seller under the Sedo Terms of Service.

6.    At the close of the auction, I received winning bid notifications for the following five (5) domain names in the Auction: photo.mobi; photos.mobi; video.mobi; videos.mobi and sports.mobi. The winning bid notifications explicitly congratulated my respective winning bids.

7.    Thereafter, I received e-mail notifications from Sedo.com essentially to the effect that the site had experienced server issues; that my winning bids were sent in error and that I was not the winner of the above-referenced names.

8.    I had never been involved in a situation such as this, where I was a winner of an auction; then received messages from the auctioneer that I was no longer the winner; and somehow the auction would restart again. It was then my opinion, and

Plaintiff Exhibit #30

continues to be my belief, that I was the winner when the auction naturally ended and that the messages sent from Sedo.com were wrong.

9.     I participated in the restart auction because I did not know what would count thereafter and I certainly wanted to keep control over the names that I had already won. I participated in the new auction to try to maintain control over my names and considered that I would work out why I was already the rightful owner to same later, if deemed necessary.

10.     Even both Sedo.com and mTld have since expressed that there were extreme levels of commotion with regard to the events that transpired at the close of the natural auction. These are presumably large, sophisticated corporations with technical and legal teams to consult with, especially during times such as these.

11.     Finally, I want to underscore that despite a formal pre-suit conference with defendants by an attorney on my behalf on or about December 12, 2007; my participation in the informal Roundtable expressing the names I believed to be mine; and, most importantly, commencing this suit, mTld still proceeded to transfer video.mobi to a third party. Clearly, the mTld has acted in bad-faith and has demonstrated a self-serving disregard of my interests to date.

Executed on this 26th day of March, 2008

_____
Paul Chmiel

Plaintiff Exhibit #30

continues to be my belief, that I was the winner when the auction naturally ended and that the messages sent from Sedo.com were wrong.

9.    I participated in the restart auction because I did not know what would count thereafter and I certainly wanted to keep control over the names that I had already won. I participated in the new auction to try to maintain control over my names and considered that I would work out why I was already the rightful owner to same later, if deemed necessary.

10.    Even both Sedo.com and mTld have since expressed that there were extreme levels of commotion with regard to the events that transpired at the close of the natural auction. These are presumably large, sophisticated corporations with technical and legal teams to consult with, especially during times such as these.

11.    Finally, I want to underscore that despite a formal pre-suit conference with defendants by an attorney on my behalf on or about December 12, 2007; my participation in the informal Roundtable expressing the names I believed to be mine; and, most importantly, commencing this suit, mTld still proceeded to transfer video.mobi to a third party. Clearly, the mTld has acted in bad-faith and has demonstrated a self-serving disregard of my interests to date.

Executed on this 26th day of March, 2008

Paul Chmiel

Plaintiff Exhibit #30